Burke, J.
The action upon which the attachment here challenged is based is brought by appellant as an instrumentality of the Government of Brazil to recover damages for a conspiracy to defraud the Government of Brazil of American dollars by illegally circumventing the foreign exchange regulations of Brazil.
Defendant-respondent, Israel Commodity, a Delaware corporation having its principal place of business in New York, is an importer of Brazilian coffee. The gist of plaintiff’s complaint is that Israel conspired with a Brazilian exporter of coffee to pay the exporter American dollars which the exporter could sell in the Brazilian free market for 220 Brazilian cruzeiros each instead of complying with Brazil’s foreign exchange regulations ■ which in effect required a forced sale of the dollars paid to the exporter to the Government of Brazil for only 90 cruzeiros. Through this conspiracy, the Brazilian exporter profited by the difference between the amount (in cruzeiros) it would have received for the dollars from the Government of Brazil and the amount it received in the open market in violation of Brazilian law, Israel profited by being able to pay less dollars for the coffee (because the dollars were worth so much more to the seller), and the plaintiff suffered a loss measured by the difference in amount it would have to pay for the same number of dollars in the open market and what it could have paid for them through the “ forced sale ” had its foreign exchange regulations been obeyed. The evasion was allegedly accomplished through the exporter’s forgery of the documents evidencing receipt of the dollars by plaintiff Banco Do Brasil, S. A., and without which the coffee could not have left Brazil.
*375 Plaintiff argues that respondent’s participation in the violation of Brazilian exchange control laws affords a ground of recovery because of article VIII (§ 2, subd. [b]) of the Bretton Woods Agreement, a multilateral treaty to which both this country and Brazil are signatories. The section provides: ‘ ‘ Exchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member maintained or imposed consistently with this Agreement shall be unenforceable in the territories of any member.” (60 IT. S. Stat. 1411.) It is far from clear whether this sale of coffee is covered by subdivision (b) of section 2. The section deals with “ exchange contracts ” which “ involve ” the u currency ” of any member of the International Monetary Fund, “ and * * * are contrary to the exchange control regulations of that member maintained or imposed consistently with ’ ’ the agreement. Subdivision (b) of section 2 has been construed as reaching only “ transactions which have as their immediate object 1 exchange,’ that is, international media of payment” (Nussbaum, Exchange Control and the International Monetary Fund, 59 Yale L. J. 421, 426), or a contract where the consideration is payable in the currency of the country whose exchange controls are violated (Mann, The Exchange Control Act, 1947, 10 Mod. L. Rev. 411, 418). More recently, however, it has been suggested that it applies to “ contracts which in any way affect a country’s exchange resources ” (Mann, The Private International Law of Exchange Control Under the International Monetary Fund Agreement, 2 International and Comp. L. Q. 97, 102; Gold and Lachman, The Articles of Agreement of the International Monetary Fund and the Exchange Control Regulations of Member States, Journal du Droit International, Paris (July-Sept., 1962). A similar view has been advanced to explain the further textual difficulty existing with respect to whether a sale of coffee in New York for American dollars “ involves the currency ” of Brazil, the member whose exchange controls were allegedly violated. Again it is suggested that adverse effect on the exchange resources of a member ipso facto “ involves ” the “ currency ” of that member (Gold and Lachman, op. cit.). We are inclined to view an interpretation of subdivision (b) of section 2 that sweeps in all contracts affecting any members’ exchange resources as doing considerable violence to the text of *376 the section. It says “involve the currency” of the country whose exchange controls are violated; not “ involve the exchange resources ”. While noting these doubts, we nevertheless prefer to rest this decision on other and clearer grounds.
The sanction provided in subdivision (b) of section 2 is that contracts covered thereby are to be “unenforceable” in the territory of any member. The clear import of this provision is to insure the avoidance of the affront inherent in any attempt by the courts of one member to render a judgment that would put the losing party in the position of either complying with the judgment and violating the exchange controls of another member or complying with such controls and refusing obedience to the judgment. A further reasonable inference to be drawn from the provision is that the courts of no member should award any recovery for breach of an agreement in violation of the exchange controls of another member. Indeed, the International Monetary Fund itself, in an official interpretation of subdivision (b) of section 2 issued by the Fund’s Executive Directors, construes the section as meaning that “ the obligations of such contracts will not be implemented by the judicial or administrative authorities of member countries, for example, by decreeing performance of the contracts or by awarding damages for their nonperformance ”. (International Monetary Fund Ann. Rep. 82-83 [1949], 14 Fed. Reg. 5208, 5209 [1949].) An obligation to withhold judicial assistance to secure the benefits of such contracts does not imply an obligation to impose tort penalties on those who have fully executed them.
From the viewpoint of the individuals involved, it must be remembered that the Bretton Woods Agreement relates to international law. It imposes obligations among and between States, not individuals. The fact that by virtue of the agreement New York must not “ enforce ” a contract between individuals which is contrary to the exchange controls of any member, imposes no obligation (under the law of the transaction — New York law*) on such individuals not to enter into such contracts. While it does mean that they so agree at their peril inasmuch as they may not look to our courts for enforcement, this again is far from implying that one who so agrees commits a tort in New *377 York for which he must respond in damages. It is significant that a proposal to make such an agreement an “ offense ” was defeated at Bretton Woods. (1 Proceedings and Documents of the United Nations Monetary and Financial Conference 334, 341, 502, 543, 546 — referred to in Nussbaum, Exchange Control and the International Monetary Fund, 59 Yale L. J. 421, 426, 429, supra.)
Lastly, and inseparable from the foregoing, there is a remedial consideration which bars recovery in this case. Plaintiff is an instrumentality of the Government of Brazil and is seeking, by use of an action for conspiracy to defraud, to enforce what is clearly a revenue law. Whatever may be the effect of the Bretton Woods Agreement in an action on “ A contract made in a foreign country between citizens thereof and intended by them to be there performed ” (see Perutz v. Bohemian Discount Bank in Liquidation, 304 N. Y. 533, 537), it is well established since the day of Lord Mansfield (Holman v. Johnson, 1 Cowp. 341, 98 E. R. 1120 [1775]) that one State does not enforce the revenue laws of another. (Government of India v. Taylor, 1 All E. R. 292 [1955]; City of Philadelphia v. Cohen, 11 N Y 2d 401; 1 Oppenheim, International Law, § 1446 [Lauterpacht ed., 1947].) Nothing in the Bretton Woods Agreement is to the contrary. In fact its use of the unenforcibility device for effectuation of its purposes impliedly concedes the unavailability of the more direct method of enforcement at the suit of the aggrieved government. By the second sentence of subdivision (b) of section 2, further measures to make exchange controls more effective may be agreed upon by the member States. This is a matter for the Federal Government which not only has not entered into such further accords but has not even enacted the enabling provision into law (U. S. Code, tit. 22, § 286h).
Therefore, the order should be affirmed and the certified questions answered no and yes respectively.

 All of respondent’s acts allegedly in furtherance of the conspiracy took place in New York where it regnlarly did business.