**Alonso MENENDEZ et al., Owner-Plaintiffs-Appellants,**

**The Republic of Cuba and Daniel Solano Pinera as Interventors, et al., Interventor-Plaintiffs-Appellants,**

**v.**

**SAKS AND COMPANY et al., Defendants-Appellants.**

**Nos. 872, 880, Dockets 72–2378, 72–2379, 72–2385, 72–2390, 72–2391, 72–2392, 72–2400, 72–2401 and 72–2402.**

United States Court of Appeals, Second Circuit.

Argued June 19, 1973.

Decided Sept. 24, 1973.

Jac M. Wolff, and Myron Cohen, New York City, for owner-plaintiffs-appellants.

Allan Blumstein, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for defendant-appellant Faber, Coe & Gregg, Inc.

Victor S. Friedman, New York City, (Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel), for defendant-appellant Alfred Dunhill of London, Inc.

John C. Grosz, New York City (Solinger & Gordon, New York City, of counsel), for defendant-appellant Saks and Co.

Victor Rabinowitz, New York City (Dorian Bowman, Eric Lieberman, Herbert Jordan, Rabinowitz, Boudin & Standard, New York City, of counsel), for interventor-plaintiffs-appellants.

Before FRIENDLY, FEINBERG and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal presents questions arising out of the Castro government's seizure, without compensation, of the businesses and assets of five leading manufacturers of Havana cigars, whose plants were situated in Cuba and whose products were shipped to importers in this country. At the time of the take-over substantially all of the stockholders, officers, directors and partners of these enterprises were Cuban citizens. Prominent among the issues before us is the extent to which the "act of state" doctrine, see Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), requires us to give effect (1) to Cuban decrees confiscating debts payable in the United States and (2) to acts of agents of the Cuban government who repudiated quasi-contractual obligations arising out of payments mistakenly made to them by United States importers.

Since the facts are thoroughly set forth in Judge Bryan's detailed opinion, 345 F.Supp. 527–564 (S.D.N.Y.1972), we here summarize only those highlights required for an understanding of our decision. On September 15, 1960, the Castro government of Cuba nationalized ("intervened")[1] five manufacturers of Cuban cigars ("the owners"): F. Palicio y Compania, S.A. ("Palicio"); Taba-

calera Jose L. Piedra, S.A. ("Tabacalera"); Por Larranga, S.A. ("Larranga"); Cifuentes y Compania ("Cifuentes"); Menendez, Garcia y Compania, Limitada ("Menendez"). For many years prior to intervention these manufacturers had produced cigars of the highest quality and reputation, bearing trademarks registered in the United States Patent Office, Cuba and other countries, and had sold the cigars to importers in the United States, principally appellants-defendants, Faber, Coe & Gregg ("Faber"), Alfred Dunhill of London ("Dunhill"), and Saks & Company ("Saks"). The importers paid for these cigars in U.S. dollars by checks drawn on New York banks and made payable either: (1) to the Cuban exporter; (2) to a New York bank acting as the exporter's collecting agent; or (3) to the order of the Cuban exporter and/or the New York collecting bank. Payments made to the New York collecting banks were transmitted by those banks to Banco Nacional de Cuba which in turn credited the exporters with pesos in their own Cuban banks.[2]

Upon the Cuban government's "intervention" the owners were immediately ousted and that government designated persons called "interventors" as its agents to manage the businesses. The interventors continued to export the cigars under the same names and trademarks to the same importers in the United States. The importers continued to make several payments through the usual channels but most of these payments were intended to cover only the amounts still owing for preintervention shipments. While the importers accepted the cigars shipped *after* intervention, they did not pay for most of them. Shipments from Cuba to the importers continued until February, 1961, when re-

1. The euphemistic term used for seizure of a business by the Cuban government is "intervention." The agents installed by the government to operate the national business are called "Interventors" (not to be confused with the term "interventors" used in civic litigation, see Rule 24, F.R.Civ.P.).

2. This method of payment through New York collecting banks was imposed on the exporters by the Castro Government shortly after it came to power as a means of insuring that the dollars would become available to the Cuban Government rather than be kept or used abroad by the exporters.

lations between the importers and interventors deteriorated for various reasons. In February, 1962, the United States declared an embargo against future trade with Cuba.

Immediately after the Cuban government's seizure of their businesses, the owners fled to the United States and retained the New York law firm of Brush & Bloch to bring several actions against the importers in New York for sums due for cigars shipped from the owners' factories in Cuba and for trademark infringement. Shortly after these actions were started, the interventors sought to enjoin Brush & Bloch from prosecuting the suits and to obtain an order substituting attorneys appointed by the interventors in lieu of Brush & Bloch as the counsel entitled to prosecute whatever claims the cigar factories had against the importers. The interventors' principal concern was to collect the sums due for cigars shipped after the intervention. They believed that the sums due for cigars shipped before the intervention were minimal, and they agreed that the owners could pursue these.

In Palicio v. Brush & Bloch, 256 F. Supp. 481 (S.D.N.Y.1966), Judge Bryan concluded that the act of state doctrine, which had been reaffirmed by the Supreme Court in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964),[3] precluded him from denying legal effect to the intervention insofar as it purported to confiscate the property of Cuban nationals located within Cuba.[4] Since the cigars shipped after the intervention had been located in Cuba at the time of the intervention, he held that the intervention was effective to transfer title to the interventors and that they rather than the owners were entitled to pursue the claims against the importers for payment for these post-intervention shipments. However, he further concluded that the intervention was not effective to deprive the owners of their trademark rights, since these trademarks were registered in the United States and had a "situs" there at the time of the intervention. Accordingly, Judge Bryan held, the owners were entitled to pursue their claims for trademark infringement. Paragraph 4 of Judge Bryan's judgment order also included the parties' agreement as to the preintervention shipment proceeds.

*Palicio* was concerned only with the effect of the intervention on the rights of the interventors and owners vis-a-vis each other. The several actions initially brought by the owners against the importer were held in abeyance pending a determination of these rights and then were adjusted to conform to the *Palicio* decision, which was affirmed by this court. 375 F.2d 1011 (2d Cir.), cert. denied, Brush v. Republic of Cuba, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967).

After *Palicio* was decided, the interventors (including the Republic of Cuba) were permitted to intervene as additional parties plaintiff in the owners' actions against the importers. Ignoring their previous agreement entered into during the *Palicio* litigation, the interventors asserted claims for preintervention as well as post-intervention shipment proceeds. They refused to stipulate that they had received any more than $93,000 of approximately $477,000 that had been paid by the importers after intervention for cigars received before intervention. The interventors did

3. The doctrine finds its classic statement in Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897) where the court declared that "the courts of one country will not sit in judgment on the acts of another done within its own territory." In *Sabbatino* the Court said that under the act of state doctrine "the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government." 376 U.S. at 428, 84 S.Ct. at 940.

4. The act of state doctrine has never been applied to attempted seizures by a foreign state of property located outside of its territory. See Henkin, The Foreign Affairs Powers of the Federal Courts, 64 Colum.L. Rev. 805, 827–28 (1964).

not deny that they had received these payments. They said merely that they could not determine from their records whether they had or had not received them.

After trial of the various claims, cross-claims, and counterclaims in this three-cornered dispute, Judge Bryan, sitting without a jury, held that the earlier *Palicio* judgment did not bar the interventors under the doctrines of *res judicata* or collateral estoppel from claiming the right, as between themselves and the owners, to the payments made by the importers for the preintervention shipments. He concluded that there had not been an adjudication of this issue because at the time of the *Palicio* agreement the parties and the court were mistaken as to the amounts possibly still owing for preintervention shipments and the parties' agreement as to who could pursue these claims had actually taken the issue out of the case. On the merits, however, he held that the owners were entitled to these proceeds because the accounts receivable from the importers at the time of the intervention were not part of the owners' property effectively seized by the intervention. He concluded that the importers were not relieved of this liability to the owners by previous payments to the New York collecting banks because at the time when the payments were made the collecting banks were acting as agents for the interventors rather than for the owners and the interventors in fact had received the payments. The sums due from the importers to the owners for the preintervention shipment of cigars were approximately: Faber, $322,000;

Dunhill, $148,000; Saks, $6,600. Judge Bryan allowed interest on these sums running from the date when the owners had instituted the various actions for their collection in 1961.

Judge Bryan held further that the importers were liable to the interventors for the value of cigars shipped after intervention. The sums due were approximately: Faber, $582,588; Dunhill, $92,949; Saks, $24,250. Interest was allowed on these amounts from the date the interventors had commenced Palicio v. Brush & Bloch. Judge Bryan ruled, however, that the importers were entitled to an offset and affirmative judgment against the interventors for the amounts that had been mistakenly paid by them to the interventors instead of to the owners for the preintervention shipments. The interventors, Judge Bryan concluded, had no right to retain these payments, and must repay them together with interest from the date when the importers had asserted their claims against the interventors. Under this ruling Faber and Saks were entitled to offsets against the interventors and Dunhill was entitled to an affirmative judgment for approximately $54,000.

As for the trademark infringement and unfair competition claims asserted by the owners against the importers and interventors, Judge Bryan held that the owners' trademark rights under the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a),[5] had not been extinguished by the intervention and the trademarks had been infringed by both the importers and interventors. The importers were also found guilty of unfair compe-

5. 15 U.S.C. § 1114(1)(a) prohibits any person, without the consent of the registrant, from using in commerce "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. . . ." 15 U.S.C. § 1125(a) provides that:
"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation . . ., and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable. . . ."

tition under New York law. However, injunctive relief was denied on the ground that future violations were unlikely. Judge Bryan also concluded that an award of damages or of an accounting for profits was neither required nor appropriate.

All parties have appealed from the district court's judgments. The interventors insist that they rather than the owners are entitled to the proceeds paid or payable by the importers for the preintervention shipments. They claim that the owners' accounts receivable were included in the property effectively seized by the intervention. They further argue that even if the owners' accounts receivable were not effectively seized the owners are entitled at most to Cuban pesos, which is all that they would have been permitted to retain had they collected on these accounts while still in Cuba, since Cuban currency regulations require a Cuban exporter who receives payment in a foreign currency to deliver the foreign currency to the "Cuban Stabilization Fund" for exchange into pesos.

The importers insist that their payments to the New York collecting banks relieved them of all liability for the preintervention shipments. If not, they say the district court correctly allowed them to recover these payments from the interventors who ultimately received them. The interventors, on the other hand, maintain that the district court erred in permitting the importers' counterclaim against them. They contend that there is insufficient evidence to support a finding that they ever received most of these payments. They also urge that, even if they did receive them, their failure to give them back upon demand constitutes an act of state which is not subject to review by an American court.

The importers insist that interest should not have been awarded to the interventors on the amounts recovered for post-intervention shipments, at least for the period prior to the interventors' intervention in the owners' actions against the importers subsequent to the *Palicio* decision.

Finally, concerning the trademark claims, the interventors seek reversal of the district court's finding that the owners retained valid trademark rights after the intervention, arguing that the court lacked jurisdiction over the subject matter when it found that there were no damages or likelihood of future infringement. The owners urge that the district court erred in not granting a permanent injunction or an accounting for profits.

### Respective Rights of Owners and Interventors

█ At the threshold we address ourselves to the owners' claim that the *Palicio* judgment bars the interventors from asserting here any right to receive payments for the preintervention shipments of cigars. It is true, as a general principle, that an adjudication by consent or agreement has the same *res judicata* effect as a judgment entered after answer and trial. See Canfield v. Elmer E. Harris & Co., 252 N.Y. 502, 505, 170 N. E. 121 (1930); Application of Millington, 188 Misc. 469, 67 N.Y.S.2d 472 (1947). However, the *Palicio* record [6] indicates that neither the parties nor the court intended that the parties' agreement concerning preintervention shipment proceeds was to constitute an adjudication of their rights with respect to these shipments. This is confirmed by Judge Bryan's statement in his opinion below that "no questions with respect to amounts due for preintervention shipments were raised or passed upon in

6. In *Palicio* Judge Bryan said that "[f]or purposes of this case the interventors are claiming only the price of the cigars shipped after the intervention." In a footnote he explained:
 "In order to avoid confusing the issues the interventor has expressed willingness to turn over to the defendants the small sum representing 'the price of cigars shipped prior to intervention,' provided the court rule in plaintiff's favor with respect to the balance." 256 F.Supp. 481, 489 & n. 8.

that case (*Palicio*)." 345 F.Supp. 527 at 535. He further found that at the time of the *Palicio* judgment both the owners and the interventors were "apparently unaware" of the size of the amounts still due from the importers from preintervention shipments, 345 F. Supp. at 527. The interventors have since informed us that they did not become aware of the size of these amounts until the owners filed amended complaints in November 1967, over a year after the *Palicio* judgment had been entered.[7]

Under these circumstances we are inclined not to give the parties' agreement effect as *res judicata* or collateral estoppel, in view of their questionable intent and their apparent mutual mistake as to a material fact. See Duncan, Inc. v. Royal Tops Mfgr. Co., 343 F.2d 655 (7th Cir. 1965). The doctrine of *res judicata* is subject to the overriding public policy that "a party must not be deprived of an actual opportunity to be heard." B. R. DeWitt, Inc. v. Hall, 19 N.Y.2d 141, 145, 278 N.Y.S. 2d 596, 600, 225 N.E.2d 195, 197 (1967). This matter "will necessarily rest on the trial court's sense of justice and equity." See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 334, 91 S.Ct. 1434, 1445, 28 L. Ed.2d 788 (1971). A party's belief as to the size of the claim is an important consideration in determining his opportunity to be heard. Cf. Schwartz v. Public Administrator, 24 N.Y.2d 65, 72, 298 N.Y.S.2d 955, 961, 246 N.E.2d 725, 729 (1969).[8]

In addition to its being barred by the *Palicio* judgment, denial of the interventors' claim is mandated by our decision in Republic of Iraq v. First National City Bank, 353 F.2d 47 (2d Cir.

1965), cert. denied, 382 U.S. 1027, 86 S. Ct. 648, 15 L.Ed.2d 540 (1966). Application of the principles of that case here satisfies us that since the owners' accounts receivable had their situs in the United States rather than in Cuba at the time of intervention and since the Cuban government's purported seizure of them without compensation is contrary to our own domestic policy, the act of state doctrine does not apply, the confiscation was ineffective, and the interventors' claim must be rejected. The owners rather than the interventors therefore remain entitled to collect these accounts.

We find no legally significant distinction between the circumstances surrounding the attempted seizure here and those in *Republic of Iraq*, where we denied legal effect to Iraq's purported confiscation of former King Faisal's money deposits and shares of stock held in New York by a New York bank. Judge Friendly there pointed out that the *Sabbatino* act of state doctrine, which applies to a foreign state's seizure of property located within its territory,[9] does not protect a foreign state's attempted seizure of debts owed by persons outside of the foreign state's territory. For purposes of the act of state doctrine, a debt is not "located" within a foreign state unless that state has the power to enforce or collect it. We concluded in *Republic of Iraq* that we will not give legal effect to a foreign state's confiscation, without compensation, of obligations which it cannot enforce on its own if the seizure is inconsistent with the laws and public policy of New York. See in accord Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co., 392 F.2d 706 (5th Cir.), cert. denied, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968).

---

7. This representation was contained in a letter sent to members of this court by counsel for the interventors subsequent to oral argument. The letter is dated June 21, 1973.

8. We also recognize that the saving clause of Rule 60(b) states that the rule "does not limit the power of a court to entertain an

independent action to relieve a party from a judgment, order or proceeding." Although the pleadings in the present action do not specifically seek such relief, the district court in effect treated them as if they did.

9. Notes 3 and 4 *supra*.

The interventors attempt to distinguish *Republic of Iraq* on the ground that it involved tangible property (a bank account) rather than intangible property such as accounts receivable. In support of their contention that the situs of intangible property is with the creditor rather than the debtor, they refer us to Farmers Loan & Trust Co. v. State of Minnesota, 280 U.S. 204, 50 S. Ct. 98, 74 L.Ed. 371 (1929) (state of debtor's domicile may not tax transfer of the debt), and Texas v. New Jersey, 379 U.S. 674, 85 S.Ct. 626, 13 L.Ed.2d 596 (1963) (state of debtor's domicile may not escheat debt). Those cases, however, had nothing to do with the power to enforce payment of a debt, which was the basis of our decision in *Republic of Iraq* and which generally depends on jurisdiction over the person of the debtor. See Harris v. Balk, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1904). Rather the Supreme Court's concern in those cases was to establish principles of comity which would avoid the odious possibility of double taxation or double liability. In both cases the Court recognized the difficulty of applying to intangible obligations, which "have no actual territorial situs," [10] the general rule permitting states to tax or escheat only that property found within its territory and concluded that for such purposes intangible obligations would be "treated" as if localized at the creditor's domicile. The policy which underlay the Court's situs determination for purposes of enforcing tax or escheat claims has no relevancy or application to claims based upon a foreign government's purported confiscation. In the absence of any showing that the importers or their agents were present in Cuba or subject to the jurisdiction of Cuban courts at the time of the intervention, we are persuaded by the reasoning of *Republic of Iraq* that no legal effect should be accorded to Cuba's purported confiscation of the importers' debts to the owners. Accordingly we hold that the intervention did not deprive the owners of their right to collect the outstanding debts owed to them by the importers for preintervention shipments.

Cuba and the interventors argue that even if the intervention did not deprive the owners of their right to collect on their accounts receivable from the importers, the district court erred in failing to apply Cuban currency regulations, which would limit the owners to ultimate receipt of pesos rather than dollars for these accounts, to the owners' suits on the accounts. Relying on Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954) (law of state with most significant contacts governs contractual obligations), Cuba and the interventors insist that Cuban law was applicable because the contracts were made and were to be performed in Cuba. A Cuban currency regulation in effect since 1959 required all exporters who received payment in a foreign currency to deliver the currency within three days to the Cuban Currency Stabilization Fund for exchange into pesos. The interventors argue that by ignoring these and other regulations [11] the district court has given the owners an unwarranted windfall at the ultimate expense of the interventors and the Republic of Cuba. [12]

██ Neither the invoices nor other documents evidencing the agreement between the parties specify that payment was to be made in Cuba or in pesos. On the contrary the business practice of the parties was that the importers for the most part would pay in dollars by checks drawn and delivered to collecting banks

---

10. 280 U.S. at 211, 50 S.Ct. 98.

11. Other regulations or "instructions" established the method of payment through New York collecting banks whereby the exporters would receive only pesos. See note 2 *supra*.

12. The theory of the interventors and Cuba is that if the owners had been awarded pesos rather than dollars, in effect they would have recovered nothing since presently there is no exchange between pesos and dollars. A nominal recovery by the owners, according to the theory, would have reduced the importers' setoff against the interventors.

located in New York, which acted as the sellers' agents. In those instances where checks were sent directly to the exporters in Cuba the checks were drawn on New York banks so that final payment was made in New York. Ordinarily, where a contract or agreement authorizes performance in any of several places, the law governing the agreement is that of the place of performance actually chosen. See, e. g., Anglo-Continentale Treuhand, A. G. v. St. Louis S'west Ry., 81 F.2d 11 (2d Cir.), cert. denied, 298 U.S. 655, 56 S.Ct. 675, 80 L. Ed. 1381 (1936).

■ Even assuming that payment for the shipments was due in Cuba and that Cuban law properly governed the discharge of this obligation, see Perutz v. Bohemian Discount Bank, 304 N.Y. 533, 110 N.E.2d 6 (1953); Werfel v. Zivnostenska Banka, 260 App.Div. 747, 23 N. Y.S.2d 1001 (1940), rev'd on other grounds, 287 N.Y. 91, 38 N.E.2d 382 (1941), the Cuban currency regulations invoked by Cuba and by the interventors do not purport to affect, alter, or abrogate the owners' contract right, which we here recognize, to receive payment in dollars.[13] Compare Norman v. Baltimore & Ohio R. R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1934), with Confederation Life Association v. Ugalde, 151 So.2d 315 (Fla.App.1964), rev'd in part, 164 So.2d 1 (Fla.1964). The currency regulations applied only *after* the dollars were received by the owners.[14] The regulations, in turn, depended for their effectiveness upon the Cuban government's control over the

owners which it lost when they fled to the United States. As between the owners and the importers the former had at all times a valid contract right to receive payment in dollars, which we hold to be enforceable in our courts.

■ Nor are we persuaded that Cuba's currency control regulations should here be given effect on the ground that not to do so would give the owners the benefit of a dollar windfall in lieu of the pesos which the Cuban government would have required them to accept in exchange for their dollars if they had remained in Cuba. The broad question of whether extraterritorial effect should be given to a foreign government's currency controls is not to be resolved on the basis of what the effect will be in a particular case but upon basic policy grounds. Currency controls are but a species of revenue law, cf. Banco Do Brasil, S.A. v. A. C. Israel Commodity Co., 12 N.Y.2d 371, 239 N. Y.S.2d 872, 190 N.E.2d 235, cert. denied, 376 U.S. 906, 84 S.Ct. 657, 11 L.Ed.2d 605 (1963). As a general rule one nation will not enforce the revenue laws of another, see Colorado v. Harbeck, 232 N. Y. 71, 133 N.E. 357 (1921), at least in the absence of an agreement between the nations involved to do so, see, e. g., Bretton Woods International Money Fund Agreement, T.I.A.S., No. 1501. While Article VIII of the Bretton Woods Agreement[15] evidenced a commitment on the part of signatory nations to enforce each other's exchange controls as a matter of international cooperation, see, e. g., Meyer, Recognition of Exchange Con-

---

13. In fact, the regulations apparently prohibited the owners from waiving any of their rights under the contracts to receive dollars. They provided that "it is . . . prohibited to make exportations whose price is collected in national currency or on the basis of any other form of compensation, without the express permission of the Fund. It is also . . . prohibited to waive the collection of foreign exchange in payment of services rendered in Cuba or to give it any other destination that will prevent the delivery thereof to the fund."

14. Currency control regulations are generally of two types: those which require surrender of foreign exchange to the government; those which prohibit contracting or payment in foreign currency. See Note, Foreign Exchange Control in American Courts, 26 St. John's Law Rev. 97 (1951).

15. Article VIII, Section 2(b) obligates each signatory nation to hold unenforceable in its territory "exchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member maintained or imposed consistently with this Agreement."

trols After the International Monetary Fund Agreement, 62 Yale L.J. 867 (1953), and in several cases American courts have given effect to a foreign nation's currency regulations as long as it remained a participating member in the Bretton Woods Fund Agreement, compare Perutz v. Bohemian Discount Bank, 304 N.Y. 533, 110 N.E.2d 6 (1953), and Confederation Life Association v. Ugalde, 164 So.2d 1 (Fla.1964), with Pan American Life Insurance Co. v. Blanco, 362 F.2d 167 (5th Cir. 1966), and Stephen v. Zivnostenska Banka National Corporation, 31 Misc.2d 45, 140 N.Y.S.2d 323, aff'd, 286 App.Div. 999, 145 N.Y.S.2d 310 (1955), Cuba has long since withdrawn from the Fund Agreement. Cuba cannot, therefore, predicate its attempted enforcement of its currency regulations upon any treaty or international agreement with the United States.

 Nor is this case governed by those decisions cited by the interventors in which the debtor's obligation was limited by agreement to payment in foreign currency or in a country where currency control was in effect. See, e. g., Pan American Life Insurance Company v. Blanco, 362 F.2d 167 (5th Cir. 1966); In re Herbert Wagg & Co., 1 All E.R. 129 (1956). In such cases the obligation may not be "enlarged by the fact that the creditor happens to be able to catch his debtor here," Deutsche Bank v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926); Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178 (1934), since an enlargement of the obligation would be tantamount to a denial of due process. See Home Insurance Co. v. Dick, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930); Confederation Life Ass'n v. Ugalde, 151 So.2d 315 (Fla.App.1963), rev'd in part, 164 So.2d 1 (Fla.1964); Tillman v. Russo Asiatic Bank, 51 F.2d 1023 (2d Cir.), cert. denied, 285 U.S. 539, 52 S.Ct. 312, 76 L.

Ed. 932 (1931); Holderness v. Hamilton, Fire Ins. Co. of New York, 54 F. Supp. 145 (S.D.Fla.1944).

 Here the agreement bound the importers to pay dollars, not pesos. It is not claimed that enforcement of that obligation constitutes a denial of due process. Although the effect of our judgment is to award to the owners dollars, which are worth more on the market than the pesos which the owners would be required by Cuban law to accept if they were in Cuba, this does not constitute a valid ground for enforcement here of Cuba's revenue laws, cf. Banco Do Brasil, S.A. v. A. C. Israel Commodity Co., 12 N.Y.2d 371, 239 N. Y.S.2d 872, 190 N.E.2d 235, cert. denied, 376 U.S. 906, 84 S.Ct. 657, 11 L.Ed.2d 605 (1963).

*Owners v. Importers*

We pass to the importers' contention that, assuming that the owners rather than the interventors were entitled to be paid for the preintervention shipments, the importers discharged their debt to the owners by continuing to make payments to the New York collecting banks as they had been doing before the intervention. The importers maintain that they were justified in continuing to make payments in the usual way because the owners failed to object.

 Based on evidence (including the importers' own admissions) establishing that the importers knew of the intervention and that new people were in charge of the factories,[16] Judge Bryan found that when they made the payments they knew that the New York collecting banks were no longer acting as agents for the owners but were in fact transmitting the payments to the interventors. This finding, supported by substantial evidence, was not "clearly erroneous" within the meaning of Rule 52(a), F.R.Civ. P., United States v. United States Gypsum, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). See also Mottaghi v.

16. Among other items of evidence there was proof that the importers paid over $40,000 directly to the interventors rather than through the collecting banks.

Barkey Importing Co., 244 F.2d 238 (2d Cir.), cert. denied, 354 U.S. 939, 77 S.Ct. 1402, 1 L.Ed.2d 1538 (1957). Indeed, in their brief and oral argument the importers did not seriously challenge the finding.[17]

The importers contend that even though they may have known that the collecting banks were transmitting the payments to the interventors rather than to the owners, the latter also "must have" had full knowledge that payments were being made in accordance with the methods that had been the authorized and established practice prior to intervention and that since the owners failed to protest or object to the continuation of the practice until February, 1961, the collecting banks should be held to have apparent authority to receive payment, which would discharge the importers of their obligation.

▮ The failure of the owners and importers, notwithstanding the fact that both met in New York and were in communication with each other immediately after the intervention, to discuss and agree upon a new procedure of payment, is troublesome. Each side attributes the other's silence to ulterior motives. The owners say that the importers deliberately made payment to the interventors, with knowledge of the latter's lack of authority, in order to promote a profitable future business relationship with the new management installed by the Castro government. The importers, in turn, assert that the exiled owners were silently permitting the payments to be made because they expected that the new management would be unable to run the business without them and would shortly write them to return to their former posts. Whatever the cat-and-mouse game that the parties may have been playing, the importers, once they were aware that their payments were being transmitted to the interventors rather than to the owners,

could establish their defense of payment only by satisfying the burden of showing that the owners authorized or ratified their payments to the interventors. See, e.g., Weber v. Bridgman, 113 N.Y. 600, 21 N.E. 985 (1889) (party making payment has burden of showing that person receiving it was authorized to do so). That burden could be satisfied here only by a showing that the owners had actual knowledge that the payments were being made to the interventors. Weber v. Bridgman, 113 N.Y. 600, 21 N.E. 985 (1889); Smith v. Kidd, 68 N.Y. 130 (1881). Cf. Newman v. Hi Hat Elkhorn Coal Co., 298 F.2d 119, rehearing denied, 302 F.2d 723, cert. denied, 371 U.S. 819, 83 S.Ct. 33, 9 L.Ed.2d 59 (1962) (estoppel by acquiescence depends on actual rather than constructive knowledge). Apparent authority, which "exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized," A.L.I., Second Restatement of Agency § 8, Comment C; cf. Armour and Company v. Celic, 294 F.2d 432 (2d Cir. 1961), would not exist without evidence of such knowledge. Since the importers fail to point to any testimony or evidence in the record showing that the owners knew of the payments to the interventors, the importers' defense of payment failed and the district court correctly decided that the importers remained liable to the owners for the price of the cigars shipped prior to intervention.

*Interventors v. Importers*

No one disputes any longer the liability of the importers to the interventors for the price of cigars shipped after the intervention. The interventors, however, seek on two grounds to overturn the district court's allowance of the importers' counterclaims against them for the payments mistakenly made to the interventors rather than to the owners for preintervention shipments.

---

17. At oral argument counsel for the importers conceded that it was a "fair inference" that they knew that their payments made after the intervention were going to the interventors rather than to the owners.

As a first ground the interventors claim that there is insufficient evidence in the record to support Judge Bryan's finding that they actually received all of the importers' payments for preintervention shipments. It is not disputed that following the intervention the importers drew checks totalling approximately $477,000 which they sent either to the Cuban factories directly or to the New York collecting banks according to their previous practices.[18] On many of the checks sent to the collecting banks, however, there were no legible endorsements indicating where the payments had gone after receipt by the collecting banks.[19] Moreover, the banks were unable to produce any records at trial identifying the parties to whom they had sent most of these payments. The interventors, noting that the Cuban assets of several New York banks had just been expropriated and that transactions between these banks and Cuban banks had been brought to a halt, suggest that the collecting banks may have retained these payments rather than have transferred them to Banco Nacional de Cuba according to their previous practice.

In the absence of evidence tending to show that the New York collecting banks in fact retained the payments Judge Bryan's inference that the banks transferred the funds to Banco Nacional de Cuba pursuant to their long established prior practice was not "clearly erroneous." In support of their suggested theory, the interventors do not show that assets of these particular collecting banks had been expropriated or that these particular banks as of the date of the payments to them had suspended any further transferral of funds to Banco Nacional de Cuba.[20] Moreover,

the interventors failed to produce any of their own records indicating whether or not they ultimately received all of the payments made to the New York collecting banks. Counsel for the interventors has suggested that relevant records may have been lost or destroyed. However, under the circumstances the interventors' failure to produce their records could properly be the basis for an inference that production of the records would have been unfavorable to the interventors. See Dow Chemical Co. (U. K.) v. S.S. Giovanella D'Amico, 297 F. Supp. 699 (S.D.N.Y.1969), and authorities there cited. We therefore decline to upset Judge Bryan's finding that the interventors did in fact receive the payments made by the importers for preintervention cigar shipments.

The interventors next argue that the act of state doctrine precludes the importers from obtaining a judgment against them for the amounts paid by mistake for preintervention shipments. The act of state defense is grounded on the fact that when the importers demanded return of the payments the interventors ignored the demands. This repudiation by representatives of the Cuban government, say the interventors, constituted an act of state not subject to review by United States courts. Judge Bryan rejected the argument on the grounds (1) that the importers' claim is not for breach of an express contract having its situs in Cuba, but for unjust enrichment, redressable as a matter of law, (2) that the obligation to repay arose in New York because the payments mistakenly made by the importers were on account of debts due and owing in the United States and were made by checks drawn on New York banks and

18. Note 2 *supra* and accompanying text.

19. A typical check would be one drawn by Dunhill on its account in the Chase Manhattan Bank payable to "Cifuentes y Cia and/or Morgan Guaranty Trust Co. of New York." Dunhill would send that check to the Morgan Guaranty Trust Company which would place on the reverse side of the check the standard New York Clearing House endorsement which is sufficient to pass title but provides no information at all as to the ultimate disposition of the funds. Information as to what disposition Morgan Guaranty made of the funds represented by the check would never appear on a check in such an interbank transaction.

20. Note 2 *supra* and accompanying text.

payable in New York, and (3) that there was no formal repudiation of the obligation to repay by the Cuban government. While the question is a difficult one we are not persuaded by any of these reasons.

■ No authority has been cited for the proposition that the act of state doctrine does not apply to a quasi-contractual claim based on unjust enrichment, as distinguished from an express contractual claim. Nor has any sound reason been advanced in support of such an exception. Having in mind that the act of state doctrine is premised on the notion that to indulge in judicial review of the conduct of a foreign sovereign within its own territory might, in the absence of clearly defined international law standards, frustrate our Executive Branch in its conduct of foreign relations of an essentially political nature, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 421–434, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); Republic of Iraq v. First National City Bank, 353 F.2d 47, 50 (2d Cir. 1965), our Executive Branch could be just as embarrassed by judicial enforcement of an implied obligation repudiated by a foreign government as by the adjudication of rights arising out of an express contract or a confiscation of American-owned property within the territorial control of the foreign sovereign. Both issues are sensitive. In the absence of clear standards of international law which have been accepted by the foreign government, the possibility of contradicting our Executive Branch in its conduct of foreign relations is readily apparent. Indeed we are advised that some countries within the Communist orbit have, upon confiscating businesses, acted more favorably in awarding compensation to the owners than to creditors whose obligations they have repudiated. Doman, Postwar Nationalization of Foreign Property in Europe, 48 Colum.L.Rev. 1125, 1158–59. In any event such a repudiation does not appear ever to have been recognized as a violation of international law. A.L.I., Restatement of Foreign Relations Law of the United States § 193, Comment C.

■ Nor do we agree that the interventors' quasi-contractual obligation to repay the importers arose in New York because it grew out of the latters' mistaken payment of debts that had been due and payable in New York or because the mistaken payment had been made by checks drawn on New York banks. The importers' contractual obligation to pay the owners, which had its situs in New York, must not be confused with the interventors' quasi-contractual obligation to return the payments mistakenly made later to them, which arose only after the funds had been received or used by the interventors, Banco Do Brasil v. Madison Steamship Corp., 61 Misc.2d 1028, 307 N.Y.S.2d 341 (1970), and a demand had been made by the importers for their return, Southwick v. First National City Bank of Memphis, 84 N.Y. 420, 430 (1881). Since the funds were received and retained by the Cuban interventors rather than by the New York collecting banks and the demand was made on the interventors (not on the banks) the obligation arose in Cuba. Indeed were it not for the voluntary appearance of the interventors and the Cuban government in this action only the courts of Cuba, where the interventors are located, would have had the power to enforce the quasi-contractual obligation. According to the criterion recognized by us in *Republic of Iraq,* therefore, i. e., the power to compel payment, the situs of the implied obligation was in Cuba.

■ Our view that the act of state doctrine applies to a foreign government's repudiation of its obligations finds support in our decision in Hewitt v. Speyer, 250 F. 367 (2d Cir. 1918) (unlawful assignment by Ecuador of bondholder-plaintiffs' security interest) and in decisions of the New York Court of Appeals in French v. Banco Nacional de Cuba, 23 N.Y.2d 46, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968) (refusal by Cuban Currency Stabilization Board to honor certificates issued by Fund which

would have entitled holders to dollars in exchange for pesos), and in Holzer v. Deutsche Reichsbahn-Gesellschaft, 277 N.Y. 474, 14 N.E.2d 798 (1938) (abrogation by German government of an employment contract). Those cases are consistent with the underlying principle of the act of state doctrine, which is to avoid judicial involvement in political matters that are essentially within the province of our Executive Branch in its conduct of foreign relations, at least in the absence of recognized standards of international law governing the issue at hand. We see no reason to depart from them here.

We also find ourselves unable to accept the district court's view that because the Cuban government's repudiation of its obligation to return the funds to the importers was informal, taking the form of a failure to honor the importers' demand (which was confirmed by the Cuban government's counsel at trial), it fails to qualify as an act of state. The test is not whether the act was embodied in a "formal . . . decree of general application," which the district court deemed essential, 345 F.Supp. at 545, but whether the agent acted within the scope of his authority as a representative of the foreign government. For instance, in Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), the fountainhead of the act of state doctrine in this country, the conduct of the foreign military commander, which was the basis of the suit, was impromptu in character and not incorporated in any "formal . . . decree of general application." Nevertheless it was held to constitute an act of state, the Supreme Court (168 U.S. at 254, 18 S.Ct. 83) approving our court's conclusion that "the acts of the official representatives of the state are those of the state itself, when exercised within the scope of their delegated powers," 65 F. 577, 579. Later, in Sabbatino, Justice Harlan, speaking on the question of whether Cuba's conduct in refusing to allow the S.S. Hornfels to sail satisfied the formal requisites of Cuban law, re-

affirmed the principle that the formal status of the conduct is immaterial, stating "If no institution of legal authority would refuse to effectuate the decree, its 'formal' status is irrelevant." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 415 n. 17, 84 S.Ct. 923, 934, 11 L. Ed.2d 804 (1964). More recently Justice Hopkins, in a concurring opinion in French v. Banco Nacional de Cuba, *supra,* took the view that the Cuban government's repudiation of its obligation to honor its Stabilization Fund certificates, quite apart from that Fund's Decision 346, "was an act of state committed within the territory of Cuba," 23 N. Y.2d at 65–66, 295 N.Y.S.2d at 451, 242 N.E.2d at 717. We agree and hold that in the absence of evidence that the interventors were not acting within the scope of their authority as agents of the Cuban government, their repudiation was an act of state even though not embodied in a formal decree.

The importers next assert (although they do not vigorously press the contention) that even if the interventors' repudiation of their quasi-contractual obligation to return the mistakenly-paid funds amounted to an act of state the interventors are precluded from invoking the act of state doctrine by the Hickenlooper Amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370(e)(2), which provides in pertinent part:

> "[N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which *a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking* . . . by an act of that state in violation of the principles of international law including the principles of compensation. . . ." (Emphasis supplied)

However, we believe for the reasons stated by us in detail in Banco Nacional

de Cuba v. First National City Bank, 431 F.2d 394 (2d Cir. 1970), that the Hickenlooper Amendment does not govern the importers' counterclaim against the interventors.

■ In *Banco Nacional de Cuba,* Judge (then Chief Judge) Lumbard, after an exhaustive analysis of the amendment's legislative history, concluded that it was intended to be limited to cases involving claims of title with respect to American-owned property nationalized by a foreign government in violation of principles of international law.[21] For instance, the amendment might be invoked by an American firm if an effort should be made to market the product of such an expropriation in the United States. Further support for this interpretation of the Hickenlooper Amendment is found in French v. Banco Nacional de Cuba, 23 N.Y.2d 46, 295 N.Y. S.2d 433, 242 N.E.2d 704 (1968), where the New York Court of Appeals held that a claim for breach of contract is not a "claim of title or other right to property" within the meaning of the Hickenlooper Amendment and that the repudiation of a contractual obligation does not amount to a "confiscation or other taking" as those terms are used in the statute. Despite Judge Keating's vigorous disagreement with the first of these holdings we are persuaded by the legislative history, and particularly by Congress' insertion in 1965 of the words "to property" immediately after the phrase "claim of title or other right," that the intent was to exclude all contract claims from the amendment.

■ Applying these principles, since the importers' counterclaim here was not a "claim of title or other right to property" and the repudiation did not amount to "a confiscation or other tak-

ing," the importers may not avail themselves of the Hickenlooper Amendment to preclude the interventors from invoking the act of state doctrine with respect to the interventors' refusal to return the payments mistakenly made to them by the importers.

From the foregoing one might conclude that the act of state doctrine must preclude the importers from enforcing their counterclaim against the interventors. And such would probably have been the result, were it not for the Supreme Court's decision in First National City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), when that case made its final trip to the Supreme Court after a long inter-court history. See 270 F. Supp. 1004 (S.D.N.Y.), 431 F.2d 394 (2d Cir. 1970), 400 U.S.1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971), 442 F.2d 530 (2d Cir. 1971). In that case the First National City Bank, following the seizure of all of its Cuban branches by the Castro government, foreclosed on a secured loan made by it to Banco Nacional de Cuba, sold the collateral securing the loan, applied the proceeds of the sale to repayment of the principal and interest, and retained the excess of approximately $1.8 million realized from the sale. When Banco Nacional brought suit for this excess in the Southern District of New York the First National City Bank counterclaimed for damages based upon the Cuban government's expropriation of its properties in Cuba. While the case was pending before the Supreme Court upon appeal from our decision, 431 F.2d 394, which held that *Sabbatino* barred enforcement of the counterclaim, the Legal Advisor of our Department of State wrote a letter to the Supreme Court to the effect that the act of state

21. Upon its review of the case the Supreme Court did not disturb this conclusion. See First National City Bank v. Banco Nacional de Cuba, 406 U.S. 759 at 780, note 5, 92 S.Ct. 1808, 1819, 32 L.Ed.2d 466, where Justice Brennan stated:

"5. In arriving at this conclusion, the court found inapplicable the Hickenlooper

Amendment to the Foreign Assistance Act of 1961, 78 Stat. 1013, as amended, 22 U.S.C. § 2370(e)(2). I agree with my colleagues in leaving that determination undisturbed."

doctrine should not bar consideration of a defensive counterclaim or offset limited to the amount of a claim for which a foreign government sued in a United States court arising out of a relationship existing between the parties when the act of state occurred, at least where the foreign policy interests of the United States did not require application of the act of state doctrine. The letter, which was in the pattern of the one that had been relied upon years earlier in Bernstein v. N. V. Nederlandsche-Amerikaansche, 210 F.2d 375 (2d Cir.1954), as providing an exception to the doctrine, concluded:

> "The Department of State believes that the act of state doctrine should not be applied to bar consideration of a defendant's counterclaim or set-off against the Government of Cuba in this *(First National City Bank) or like cases.*" (Emphasis supplied)

Upon remand of the case to our court for reconsideration in the light of the letter, we adhered to the view that the act of state doctrine governed, holding that the "Bernstein-letter" doctrine should be limited to the unique circumstances of that case.

When the *First National City Bank* case again reached the Supreme Court a majority concluded, in a 5 to 4 vote, that despite the act of state doctrine a counterclaim limited to the amount sought by the foreign sovereign was enforceable. Although five justices agreed upon the result, they differed as to the reasons. In an opinion by Justice Rehnquist three justices (Chief Justice Burger and Justices White and Rehnquist) based their decision principally on the Bernstein-type letter submitted by the State Department. Justice Douglas, relying on National City Bank v. Republic of China, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955), rested his vote solely on the ground (asserted in his separate opinion) that it would offend our sensibilities if

> "Cuba could collect the amount owed on liquidation of the collateral for the loan and not be required to account for any set off. To allow recovery without more would permit Cuba to have her cake and eat it too."

Five justices rejected the notion that application of the act of state doctrine should depend upon the dollar value of the counterclaim. However, Justice Powell, although rejecting the applicability of *Bernstein* or *Republic of China,* upheld the counterclaim on the ground that upon a careful case-by-case examination, which he would require, exercise of jurisdiction in the immediate case would not interfere with foreign relations. The four-judge minority, rejecting both the *Bernstein* and *Republic of China* exceptions, maintained that *Sabbatino* required application of the act of state doctrine.

Based upon our analysis of this case in the light of the varying views asserted by the justices in *First National City Bank* we are persuaded that, while the issue can hardly be resolved with crystal clarity, a majority of the Supreme Court, if the members adhered to the views there stated, would uphold the importers' counterclaims in the present case up to the limits of the respective claims asserted against them by the interventors. Application of the principles of *Bernstein* and *Republic of China* would mandate such a result. Careful examination of the facts according to the principle advocated by Justice Powell would call for the same result, especially since the counterclaim here, unlike that in *First National City Bank,* arises out of a course of dealing with respect to the same subject matter (sale of Cuban-manufactured cigars) between the same parties or their successors. Indeed, the equities here balance much more heavily in favor of the importers than in the *First National City Bank* case where the counterclaim arose out of a wholly unrelated factual context. The effect may be to give the importers a preference over other victims of Cuban expropriations. However, since this consideration was not found to be of controlling persuasiveness by the

Supreme Court we deem it insufficient to tip the balance here.

■ Accordingly we hold that each of the importers' counterclaims is allowed up to the limit of the interventors' claims against it. However, the district court's decision, to the extent that it awards an affirmative judgment in favor of Dunhill in excess of the claims against it, is reversed.

*Interest*

■ The district court ordered the importers to pay prejudgment interest to the interventors on the amounts due for post-intervention shipments from the date of commencement of the *Palicio* suit (June 28, 1961). The importers argue that since they were unable to obtain jurisdiction over the interventors or to interplead until May 16, 1967, when the latter intervened in the owners' action against the importers, the award is inequitable. The short answer is that N.Y. CPLR § 5001 mandates the award from the earlier date. It provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . ." and ". . . shall be computed from the earliest ascertainable date the cause of action existed. . . ." We have recently reaffirmed that this provision does not allow any discretion on the part of the trial court in cases within its purview. Spector v. Mermelstein, 485 F.2d 474, 481 (2d Cir. 1973).

■ Even if discretion were permissible we would not find any "plain abuse" of it by the district court in this case. Graves v. Mount Vernon Trust Co., 69 F.2d 101 (2d Cir. 1934), aff'd as modified, United States v. Equitable Trust Co., 283 U.S. 738, 51 S.Ct. 642, 75 L.Ed. 1379 (1935); National Ben. Life Ins. Co. v. Shaw-Walker Co., 71 App.D. C. 276, 111 F.2d 497, cert. denied, 311 U.S. 673, 61 S.Ct. 35, 85 L.Ed. 432 (1940). The risk of double liability, while a factor to be weighed, is not enough to require denial of interest, see Bank of China v. Wells Fargo Bank &

Union Trust Co., 209 F.2d 467 (9th Cir. 1953), particularly when, as here, the importers had the use of the money during the period in question. See Agnew v. Board of Education, 83 N.J.Eq. 49, 89 A. 1046 (1914). We find no merit in the contention that the interventors somehow or other acquiesced in the importers' retention of the amounts due them by choosing to bring the *Palicio* action rather than intervene immediately in the owners' pending suit against the importers. The *Palicio* proceeding, rather than being instituted for purpose of delay or to frustrate any effort by the importers to gain personal jurisdiction, was characterized by Judge Bryan as "a sound vehicle for expeditiously determining basic issues of great importance to the parties involved with a minimum of inconvenience to those parties and to the court." 256 F.Supp. at 486. The district court further found that "the importers made no effort to employ any of such remedies (e. g. interpleader) or to determine whether the interventors, represented by responsible counsel in *Palicio* were willing to appear." 345 F. Supp. at 548. Accordingly we affirm the award of prejudgment interest from the date of institution of the *Palicio* suit.

*Trademark Infringement*

At the time of confiscation the owners were the holders of trademarks, registered in the United States Patent Office and in other countries, for the major brands of cigars made by them in Cuba and sold to the importers. In *Palicio, supra,* affirmed by us on appeal, 375 F. 2d 1011, cert. denied sub nom. Brush & Bloch v. Republic of Cuba, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967), the court held that confiscation did not affect the owners' rights in the marks and that as between the owners and interventors the former were entitled to pursue claims for trademark infringement and unfair competition that had been asserted in the actions that have since become the subject of the appeal now before us. When the interventors then intervened

in those actions the owners amended their complaints to assert separate claims against the interventors for trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a), and unfair competition, based upon the latter's post-intervention sales of cigars bearing the owners' registered marks.

In his thorough opinion Judge Bryan upheld the validity of the owners' trademarks and, after reviewing and rejecting various defenses interposed by the interventors and importers, held that their use of the owners' trademarks on the postintervention shipments violated the Lanham Act and constituted unfair competition in violation of New York law. However, since there had been no infringement since February, 1961, and there appeared to be no likelihood of further infringement in the foreseeable future, injunctive relief was denied. Exercising the discretion vested in the court by 15 U.S.C. § 1117, see Monsanto Chemical Co. v. Perfect Fit Products Co., 349 F.2d 389, 395 (2d Cir. 1965), cert. denied, 383 U.S. 942, 86 S.Ct. 1195, 1198, 16 L.Ed.2d 206 (1966), Judge Bryan further declined to award damages or an accounting, in view of the owners' failure to show any injury to their businesses or reputations as a result of the infringement. All parties appeal, the owners from the denial of relief and the importers and interventors from the court's ruling on the issues of ownership, validity and infringement.

 The owners argue that once the court found a violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114, issuance of an injunction was mandatory.[22] We disagree. The grant of injunctive relief depends upon whether such relief is necessary as a matter of equity to relieve against threatened further violations. General Fireproofing Company v. Wyman, 444 F.2d 391, 393 (2d Cir. 1971). "[I]t is elementary that a court of equity will not enjoin one from doing what he is not attempting and does not intend to do," Negron v. Wallace, 436 F.2d 1139, 1145 (2d Cir. 1971) (quoting from New Standard Publishing Co. v. FTC, 194 F.2d 181, 183 (4th Cir. 1952)).[23] Here Judge Bryan found that the last shipment by the interventors of cigars bearing the owners' trademarks was made in February 1961 and that there was no likelihood of further violations in the foreseeable future. These findings, supported by the record, are not clearly erroneous and justify denial of relief. Similarly, we fail to find any abuse of discretion in the district court's application of the principles of Carl Zeiss Stiftung v. VEB Carl Zeiss Jena, 433 F.2d 686 (2d Cir. 1970), cert. denied, 403 U.S. 905, 91 S.Ct. 2205, 29 L. Ed.2d 680 (1971), to deny an accounting or damages.

Our affirmance of the denial of injunctive relief and damages renders it unnecessary to consider the importers' argument that the owners should have been estopped from asserting infringement claims. However, the interventors press, apparently for the first time, two more arguments in support of their contention that the district court should not have ruled on the issues of ownership and infringement. Their first claim is that since Judge Bryan found no past damage and no threat of infringement in the foreseeable future, the issues of validity and infringement are long since moot and, absent a justiciable case or controversy, the court was powerless under Article III of the constitution to adjudicate such hypothetical issues. See Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); Aetna v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). In support of this argument the interventors rely princi-

---

22. Since there is no material difference in the law governing relief based upon trademark infringement and unfair competition, the claims are treated as one for present purposes.

23. Tisch Hotels Inc. v. Americana Inn Inc., 350 F.2d 609, 615 (7th Cir. 1965), relied upon by the owners, dealt with an *ongoing* infringement and is therefore inapposite.

pally upon decisions in patent infringement suits holding that a decision against the plaintiff as to one issue (validity or infringement) precludes an adjudication as to the other. See, e. g., Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943); Cover v. Schwartz, 133 F.2d 541 (2d Cir. 1942), cert. denied, 314 U.S. 748, 63 S. Ct. 1158, 87 L.Ed. 1703.

■■■ The principles urged by the interventors, while properly invoked to bar adjudication of a claim that has been mooted on the merits, have no application here.[24] To suggest that because relief would in all probability be denied a decision as to the merits of a plaintiff's claim must be precluded is to put the cart before the horse. Before a court reaches the question of what relief, if any, would be appropriate, it must first decide whether the plaintiff has established a claim on the merits. *Compare* Oklahoma Natural Gas Corp. v. Municipal Gas Co., 113 F.2d 308 (10th Cir. 1940) (defendant held to have breached its contract with plaintiff although plaintiff entitled to nominal damages only) and Cook Industries, Inc. v. Carlson, 334 F.Supp. 809 (N.D.Miss.1971) (defendant held to have wrongfully injured plaintiff although plaintiff entitled to nominal damages only) with Field Enterprises Educational Corp. v. Cove Industries, Inc., 297 F.Supp. 989 (E.D.N.Y.1969) (decision that defendant was guilty of unfair competition although plaintiff denied any immediate equitable or legal relief). *See also* Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U.S. 249, 263, 53 S.Ct. 345, 77 L.Ed. 730 (1933). Here Judge Bryan, properly taking the first step first, found that the owners' trademarks were valid and had been infringed. In denying relief because of the absence of any violations in the foreseeable future, he implicitly left the door open, should circumstances

change, for the owners to apply for modification of the judgment. The possibility of such a change was alluded to by him, in denying the interventors' claim that the owners had abandoned the marks, when he pointed out:

> "Moreover, it could scarcely be said during that period that it would be impossible for them to obtain Cuban tobacco, on which there was then no embargo, in the future, or even to resume association with their businesses in Cuba. Among the many possibilities were a change in the policy or in the composition of the government of Cuba, the failure of the interventors to operate the factories effectively thus necessitating recall of the owners to Cuba in a managerial capacity, or the finding of an independent source of supply of Cuban tobacco. It will serve no useful purpose to explore these possibilities further or to discount them in terms of hindsight." 345 F.Supp. at 554.

Furthermore, the judgment specifically provided that injunctive relief was denied "without prejudice to an application for such relief under appropriate circumstances in the future," which we interpret as a retention of jurisdiction by the district court permitting the owners, should circumstances change, to modify the judgment so that relief might be granted.

■■■ The interventors further argue that because the trademarks have always been associated with cigars made in Cuban factories from a unique tobacco found only in the Vuelta Abajo region of Cuba and because the owners, since the 1960 confiscation of their businesses by the Cuban government, have not had any means of obtaining such tobacco for the manufacture of such cigars, they no longer retain any enforceable rights in the trademarks. The sole authority of-

---

24. The distinction between cases mooted on the merits and the present type of case, where relief only is desired, was noted in Cover v. Schwartz, *supra*, where Judge Frank observed that a decision on an issue going

to the merits (infringement) does not affect "merely the question of damages" but "is indispensable to the very existence of a case or controversy," 133 F.2d at 545.

fered in support of this novel theory is our decision in Mulhens and Kropff Inc. v. Muehlens Inc., 43 F.2d 937 (2d Cir. 1930), cert. denied, 282 U.S. 881, 51 S. Ct. 84, 75 L.Ed. 777, holding that, where a trademark is associated with a product containing an ingredient made according to a secret formula and the holder of the mark applies it to a spurious or counterfeit product not containing the essential ingredient, his deception of the public precludes his being protected in his use of the mark. However, the principles of that decision do not aid the interventors. Aside from a few token shipments, found by Judge Bryan to be *de minimis,* the owners have not employed their marks on cigars containing non-Cuban tobacco or engaged in any form of deceptive use of the mark, which forms the underpinnings of *Mulhens and Kropff Inc.* Nor can we, on this belatedly-raised issue, assume that the owners will not be able, during the lifetime of their marks, to obtain access to Cuban tobacco of the quality associated with the marks, much less that the American public would be deceived if the marks were now used on a high-quality non-Cuban tobacco. In short an interruption due to the unavailability of Cuban tobacco would not necessarily preclude the owners from future enforcement of their trademarks. Cf. Kelly Liquor Co. v. National Brokerage Co., 102 F.2d 857, 26 CCPA, Patents 1110 (1939); Pennsylvania Co. for Insurance on Lives v. Patterson & Coane, Inc., 38 U.S.P.Q. 276 (D.C.N.J.1938) (nonuser of trade mark because of extraordinary circumstances does not constitute abandonment)

Finding no merit in these or other trademark issues raised by the parties, we affirm the findings, conclusion and judgment of the district court with respect to the trademark claims.

*Conclusion*

The district court's decision is affirmed as to all issues except as to its allowance of the importers' counter-

claims against the interventors, each of which is limited to the amount awarded in favor of the interventor against the importer asserting the counterclaim. The case is remanded for entry of judgments as so modified. Each party will bear its own costs incurred upon this appeal.