36 N.Y.2d 592 (1975)
Banco Frances E. Brasileiro S. A., Appellant,
v.
John Doe No. 1, Respondent, et al., Defendants. Martin E. Silfen, Respondent.
Court of Appeals of the State of New York.
Argued February 21, 1975.
Decided May 8, 1975.
Donald N. Dirks, Philip C. Potter, Jr. and Mark L. Austrian for appellant.
Martin E. Silfen, P.C., and Stephen Gillers for John Doe No. 1, respondent.
Herman E. Cooper for Martin E. Silfen, respondent.
Chief Judge BREITEL and Judges GABRIELLI, JONES, FUCHSBERG and COOKE concur with Judge JASEN; Judge WACHTLER dissents and votes to affirm in a separate opinion.
*595 JASEN, J.
The principal question before us is whether a private foreign bank may avail itself of the New York courts in an action for damages for tortious fraud and deceit and for rescission of currency exchange contracts arising from alleged violations of foreign currency exchange regulations.
Plaintiff, a private Brazilian bank, brings this action for fraud and deceit, and conspiracy to defraud and deceive, against 20 "John Doe" defendants whose identities are unknown to it. The gravamen of plaintiff's complaint is that these defendants over a period of approximately six weeks participated, in violation of Brazilian currency regulations, in the submission of false applications to Banco-Brasileiro of Brazil, which the plaintiff relied upon, resulting in the improper exchange by the bank of Brazilian cruzeiros into travelers checks in United States dollars totaling $1,024,000. A large amount of the fraudulently obtained travelers checks were deposited by defendant "John Doe No. 1" in an account having a code name of "Alberta" at Bankers Trust Company, New York. Other of such travelers checks were deposited by defendant "John Doe No. 2" in an account having the code name of "Samso" at Manfra Tordella & Brookes, Inc., New York. An order of attachment was granted at Special Term against the property of defendants John Doe No. 1 and John Doe No. 2 held by Bankers Trust and Manfra Tordella & Brookes, Inc. Service of summons by publication was authorized by Special Term.
Subsequent to the granting of the order of attachment and the service of the summons by publication, motions were made by the plaintiff for disclosure from Bankers Trust Co. and Manfra Tordella & Brookes of the true names and addresses of John Doe Nos. 1 and 2 and to direct the attorney for defendant John Doe No. 1 to disclose the true name(s) and address(es) of defendant(s) and the basis of the attorney's authority to act, or, in the alternative, to vacate his appearance in the action. The defendant John Doe No. 1, by way of order to show cause, moved to vacate the order of attachment, *596 to dismiss plaintiff's complaint and to intervene in the motion of plaintiff for disclosure from Bankers Trust Co. so as to defend against the disclosure.
Special Term, inter alia, denied the motion to vacate the order of attachment and to dismiss the complaint except as to the third cause of action for damages which was dismissed for failure to plead actual damages. Motions for ancillary relief  for discovery and inspection and for disclosure from the attorney for defendant "John Doe No. 1" of the name and address of his client  were granted.
On cross appeals, the Appellate Division, by a unanimous court (44 AD2d 353), relying on Banco do Brasil v Israel Commodity Co. (12 N.Y.2d 371, cert den 376 US 906), modified by granting defendants' motion to dismiss the complaint and denying all applications for ancillary relief on the ground that the New York courts were not open to an action arising from a tortious violation of foreign currency regulations.
Plaintiff bank appeals as of right to this court. (CPLR 5601, subd [a].) We are unable to assent to the decision of the Appellate Division and, accordingly, modify the order appealed from by reinstating the order of attachment and the first two causes of action, with leave to plaintiff, if so advised, to apply to Special Term for permission to serve a supplemental pleading alleging special damages in its third cause of action for damages, and by granting the ancillary relief requested to the extent hereafter specified.
It is an old chestnut in conflict of laws that one State does not enforce the revenue laws of another. By way of rationale, an analogy is drawn to foreign penal laws, extrastate enforcement of which is denied (see The Antelope, 10 Wheat [23 US] 66, 123) to deny recognition to foreign tax assessments, judicially expanded also to include foreign currency exchange regulations. The analogy, reformulated in the Restatement (Restatement, Conflict of Laws, §§ 610, 611), but interestingly withdrawn in the Restatement Second (§ 89), traces from Lord MANSFIELD'S now famous dictum in an international smuggling case that "no country ever takes notice of the revenue laws of another." (Holman v Johnson, 1 Cowp 341, 343.) But the modern analog of the revenue law rule is justifiable neither precedentially nor analytically.
Holman v Johnson was an action for goods had and received. The plaintiffs, Frenchmen, sold and delivered tea to the defendant in France. The tea was then smuggled into *597 England by the defendant in violation of the revenue laws. In an action for the price, Lord MANSFIELD'S holding was simply to the effect that a French court would not invalidate a sale of tea by a Frenchman in France made in violation of an English prohibition. The decision was concerned largely with the impact of foreign revenue laws on international commerce, but the quoted dictum became the basis in this country for denying foreign tax authorities the right to collect taxes assessed by them. But certainly that case and earlier (e.g., Boucher v Lawson, 95 Eng Rep 53) and later (e.g., Planche v Fletcher, 1 Dougl 250) dicta in other cases denying extraterritorial effect to forum defenses, should not have been relied upon to deny forum effect to foreign claims.
Nor is the rule analytically justifiable. Indeed, much doubt has been expressed that the reasons advanced for the rule, if ever valid, remain so. (E.g., Leflar, Extrastate Enforcement of Penal and Governmental Claims, 46 Harv L Rev 193.) But inroads have been made. In interstate cases, for example, where the rule made least sense, administrative tax assessments are increasingly equated with tax judgments (Milwaukee County v White Co., 296 US 268) and on that basis generally afforded full faith and credit. (State of Oklahoma ex rel. Oklahoma Tax Comm. v Neely, 225 Ark 230; Ehrenzweig, Conflict of Laws, § 49; but see City of Philadelphia v Cohen, 11 N.Y.2d 401.) Some do consider that, in light of the economic interdependence of all nations, the courts should be receptive even to extranational tax and revenue claims as well, especially where there is a treaty involved, but also without such constraint. (Scoles, Interstate and International Distinctions in Conflict of Laws in the United States, 54 Cal L Rev 1599, 1607-1608.) Indeed, there may be strong policy reasons for specially favoring a foreign revenue regulation, using that term in its broadest sense, especially one involving currency exchange or control.
In the international sphere, cases involving foreign currency exchange regulations represent perhaps the most important aspect of the revenue law rule. This assumes, of course, that a currency exchange regulation, normally not designed for revenue purposes as such, but rather, to prevent the loss of foreign currency which in turn increases the country's foreign exchange reserves, is properly characterizable as a revenue law. (Contra, Kahler v Midland Bank [1950], A C 24; Dicey, Conflict of Laws [7th ed], p 920.) At any rate, it is for the forum to *598 characterize such a regulation and in this State the question would appear to have been resolved for the present at least by Banco do Brasil v Israel Commodity Co. (12 N.Y.2d 371, 377, cert den 376 US 906, supra).
But even assuming the continuing validity of the revenue law rule and the correctness of the characterization of a currency exchange regulation thereunder, United States membership in the International Monetary Fund (IMF) makes inappropriate the refusal to entertain the instant claim. The view that nothing in article VIII (§ 2, subd [b]) of the Bretton Woods Agreements Act (60 US Stat 1401, 1411)[*] requires an American court to provide a forum for a private tort remedy, while correct in a literal sense (see Banco do Brasil v Israel Commodity Co., supra, p 376), does not represent the only perspective. Nothing in the agreement prevents an IMF member from aiding, directly or indirectly, a fellow member in making its exchange regulations effective. And United States membership in the IMF makes it impossible to conclude that the currency control laws of other member States are offensive to this State's public policy so as to preclude suit in tort by a private party. Indeed, conduct reasonably necessary to protect the foreign exchange resources of a country does not offend against international law. (Restatement, 2d, Foreign Relations Law of the United States, § 198, comment b.) Moreover, where a true governmental interest of a friendly nation is involved  and foreign currency reserves are of vital importance to a country plagued by balance of payments difficulties  the national policy of co-operation with Bretton Woods signatories is furthered by providing a State forum for suit.
The Banco do Brasil case relied upon by the Appellate Division is quite distinguishable. There the Government of Brazil, through Banco do Brasil, a government bank, sought redress for violations of its currency exchange regulations incident to a fraudulent coffee export transaction. Here, the plaintiff is a private bank seeking rescission of the fraudulent currency exchange transactions and damages. And no case has come to our attention where a private tort remedy arising *599 from foreign currency regulations has been denied by the forum as an application of the revenue law rule and we decline so to extend the Banco do Brasil rationale. Thus, in the instant case we find no basis for reliance upon the revenue law rule to deny a forum for suit. Moreover, where the parties are private, the "jealous sovereign" rationale is inapposite (cf. Loucks v Standard Oil Co., 224 N.Y. 99, 102-103 [CARDOZO, J.]) even as it might seem inapposite in the Banco do Brasil situation where the sovereign itself, or its instrumentality, asks redress and damages in a foreign forum for violation of the sovereign's currency laws. (But cf. Moore v Mitchell, 30 F.2d 600, 603 [L. HAND, J., concurring].)
Perutz v Bohemian Discount Bank in Liquidation (304 N.Y. 533) is consistent with an expansive application of the IMF agreement to which we here ascribe (cf. Kolovrat v Oregon, 366 US 187, 196-198), although there it is true defensive use of foreign currency exchange regulation was made and upheld by this court. But interestingly, in Perutz, in contrast to the instant case, political relations at the time were not conducive to comity which nevertheless was extended.
With regard to the ancillary relief sought  discovery and inspection of Bankers Trust and Manfra Tordella & Brookes  we agree with Special Term that it should be granted to the extent stated by that court. And insofar as disclosure is sought from the attorney for John Doe No. 1 of the true name and address of his client, we conclude that on the record before it Special Term did not abuse its discretion in ordering disclosure. (CPLR 4503; Matter of Kaplan [Blumenfeld], 8 N.Y.2d 214, 218-219.) But that is not to say that in a given situation disclosure might be inappropriate because it is inconsistent with the purpose of representation. Therefore, we would add the caveat that if consistent with his trust and the duty assumed to his client, the attorney for John Doe No. 1 cannot disclose his client's true identity, his right, alternatively, to withdraw from this case must be recognized.
Finally, subsequent to the commencement of this action, a penalty was levied by the Central Bank of Brazil, and paid by the plaintiff, on account of the alleged fraudulent currency exchange transactions. Therefore, our decision today is without prejudice to a proper application by plaintiff to Special Term to allege by supplemental pleading such sum as an element of special damages on the third cause of action. *600 (CPLR 3025, subd [b]; cf. Morrison v National Broadcasting Co., 19 N.Y.2d 453.)
Accordingly, the order of the Appellate Division should be modified in accordance with the views here expressed and the action remitted to the Supreme Court, New York County.
WACHTLER, J. (dissenting).
We are asked to determine when claims between private parties which spring from jural relationships created by the laws of a foreign country, here Brazil, may be enforced in our courts. The issue turns on the essential nature of the rights and obligations sought to be enforced as the forum court characterizes them. As stated by the United States Supreme Court: "The test is not by what name the statute is called by the legislature or the courts of the State in which it was passed, but whether it appears to the tribunal which is called upon to enforce it to be, in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a private person." (Huntington v Attrill, 146 US 657, 683; also City of Philadelphia v Cohen, 11 N.Y.2d 401, 406; State of Maryland v Turner, 75 Misc 9, 11.)
I believe that the relief sought here, albeit indirectly through plaintiff bank, is an aspect of the Brazilian government's sovereign management of the economy of its own country. This is not a matter involving the resolution of private rights only as those rights are defined under the laws of a foreign State. Were that so our courts would not withhold judicial sanction even if the definition of such private rights were somewhat different from our own, "unless some sound reason of public policy makes it unwise for us to lend our aid" (Loucks v Standard Oil Co., 224 N.Y. 99, 110).
There is no allegation in this complaint that defendants intended to or succeeded in defrauding plaintiff of foreign currency exchange in the private rights sense. On the contrary, from all that appears, defendants obtained no more United States dollars in consequence of their alleged fraud than they would have been entitled to receive at the then currently effective exchange rate for the Brazilian cruzeiros which they exchanged with plaintiff bank. The gravamen rather is that the fraud and deceit practiced by the defendants induced plaintiff bank to violate Brazilian currency exchange regulations, thereby exposing that bank to consequent penalties which would be imposed by the Brazilian Government.
*601 It has long been recognized that the courts of one jurisdiction will not enforce the tax laws, penal laws, or statutory penalties and forfeitures of another jurisdiction. "The rule that the courts of no country execute the penal laws of another applies not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the State for the recovery of pecuniary penalties for any violation of statutes for the protection of its revenue, or other municipal laws". (Wisconsin v Pelican Ins. Co., 127 US 265, 290; also The Antelope, 10 Wheat [23 US] 66, 122-123; Huntington v Attrill, supra; Holman v Johnson, 1 Cowp 341; Banco do Brasil v Israel Commodity Co., 12 N.Y.2d 371, 377, cert den 376 US 906; City of Philadelphia v Cohen, supra; James & Co. v Second Russian Ins. Co., 239 N.Y. 248, 257.) Under the principle of territorial supremacy, fundamental to the community of nations, courts refuse to enforce any claim which in their view is a manifestation of a foreign State's sovereign authority (Dicey & Morris, Conflict of Laws [8th ed], p 160; cf. Judge LEARNED HAND'S concurring opinion in Moore v Mitchell, 30 F.2d 600). The proper question is whether in the particular instance the claim sought to be enforced is a manifestation of such sovereign authority.
In previous cases our court held that governmental foreign exchange regulation may present an aspect of the exercise of sovereign power by a foreign State to implement its national fiscal policy. Thus, in Banco do Brasil v Israel Commodity Co. (supra), we decided that our courts were not open to enforce a Brazilian foreign currency exchange regulation. Although the regulation in that case was characterized as a revenue measure, the essence of the matter was that we declined to enforce what we considered to be an exercise of Brazil's sovereign power. Whether a regulation denominated "currency exchange regulation" has or does not have a revenue-producing effect, it must be presumed to have been adopted to accomplish fiscal regulation and ultimate economic objectives significantly similar to, if not identical with, the objectives which underlie what would be characterized as revenue measures  namely, governmental management of its economy by a foreign country. Accordingly, the result is not determined by the threshold appearance of the particular law sought to be enforced or whether such law be denominated by the foreign government as a penal law or a revenue law or otherwise. The bottom line is that the courts of one country will not enforce *602 the laws adopted by another country in the exercise of its sovereign capacity for the purpose of fiscal regulation and management.
Although our earlier decisions in Perutz v Bohemian Discount Bank in Liquidation (304 N.Y. 533), and Industrial Export & Import Corp. v Hongkong & Shanghai Banking Corp. (302 N.Y. 342), may appear to be to the contrary, a studied analysis dispels this apparent inconsistency. These cases merely refine the traditional conflict-of-laws rule by holding that the provisions of any international agreement to which the United States is a party supplement, and to that extent, supersede the traditional rule. For instance, the Bretton Woods Agreement Act (US Code, tit 22, § 286), authorizes United States membership in the International Monetary Fund (60 US Stat 1401; 2 US Treaty Developments, Dec. 27, 1945, T.I.A.S. 1501). Another example of such a treaty is article VIII (§ 2, subd [b]) of the International Monetary Fund Agreement (60 US Stat 1411) making exchange contracts which are contrary to the exchange control regulations of a member (Brazil is a member) unenforceable in the territory of another member (United States). So in Perutz (supra), relying on the provisions of the Bretton Woods Agreement Act we refused to enforce a private agreement contrary to Czechoslovakian exchange control regulations. Similarly, in Industrial Export & Import Corp. (supra), we refused to enforce a private contract contrary to the currency regulations of China on the basis of a separate agreement between the United States and China. Thus, by treaty provision what would otherwise have been the applicable rule of judicial nonrecognition of sovereign acts of a foreign State may be modified in the area of currency exchange control to require courts in the member States (including courts in the United States) to recognize foreign currency regulation as a defense.
Nothing in the Bretton Woods Agreement Act or in any other agreement between the United States and Brazil of which we are aware, however, mandates a complete abrogation of the normal conflicts rule or requires our courts affirmatively to enforce foreign currency regulation, as we are invited to do in the present case. This distinction was expressly recognized and held to be dispositive in Banco do Brasil (supra), in which we said (p 376): "An obligation to withhold judicial assistance to secure the benefits of such contracts [i.e., those violative of the foreign currency control regulation] does *603 not imply an obligation to impose tort penalties on those who have fully executed them." (See Dicey & Morris, Conflict of Laws [8th ed], op. cit., p 161, n 19; pp 898-900.)
The appellant seeks to distinguish our decision in Banco do Brasil on the ground that the plaintiff in that case was recognized as an instrumentality of the Brazilian Government. I find this unpersuasive. As Judge CARDOZO noted in the Loucks case (supra), a statute will be deemed to reflect the Sovereign's interest if it "awards a penalty to the state, or to a public officer in its behalf, or to a member of the public, suing in the interest of the whole community to redress a public wrong * * * The purpose must be, not reparation to one aggrieved, but vindication of the public justice." (Loucks v Standard Oil Co., supra, pp 102-103; cf. Huntington v Attrill, supra, pp 673, 681-682). Whenever vindication of the public interest is sought at the instance of a third person, as here by plaintiff bank, of necessity such third party must show "aggrievement" or no cause of action will lie. But any such formulation is incomplete.
The core of the issue here is enforcement of a Brazilian currency exchange regulation. The only "reparation" sought by this plaintiff is for damages sustained in consequence of violation of that regulation  penalties to be imposed on it by the Brazilian Government plus associated injury to its business and reputation in consequence of such violation. Damages which are wholly attributable to violation of such a regulation, although alleged to have been occasioned by defendants' fraud, do not convert the action to one solely for private reparation. The ultimate economic reality, of granting relief to the plaintiff bank, would be the imposition on defendants of sanctions for violation of currency exchange control.
I recognize that this case is not an instance of recourse sought by a foreign country in our courts for the direct enforcement of its foreign currency exchange regulations, as would be the case were the Brazilian Government seeking here to recover penalties from either Banco-Brasileiro or from the defendants. The rights of private parties will be significantly affected; it is alleged that plaintiff bank has suffered and will suffer detriment in its private capacity in consequence of the fraud and deceit of defendants. The resolution of the issue posed by the motion to dismiss does not depend on the incidental, inescapable fact that private rights have already been, and would be affected by the judicial relief sought. *604 Rather, the determinative factor is that the primary objective and the ultimate practical effect of the relief sought would be the enforcement of the currency regulation system of a foreign country. Our courts are not open for the accomplishment of that end, and that it may be sought through private intermediaries does not change the result. It matters not whether enforcement is sought directly or indirectly (Dicey & Morris, Conflict of Laws [8th ed], op. cit., pp 160-161).[*]
I consider the plaintiff's complaint as an attempt to utilize the judicial machinery of our courts to enforce the exercise of the sovereign power by the Government of Brazil. I believe that our courts, under traditional and established principle, are not available for this purpose.
The majority, however, argues that the time may have come for a change in what historically has been the applicable rule. I recognize that strong arguments can be mounted for a change in view of the increased frequency and importance of international commerce and the significantly different perspective in today's world in which one nation views another nation and its interests. In my opinion, however, the responsibility for any change lies with our Federal Government rather than with the highest court of any single State. Change, if at all, in my view, would better come at the hands of the State Department and the Congress, through the negotiation of international agreement or otherwise in the discharge of the constitutional responsibility of the Federal Government "to regulate commerce with foreign nations" (cf. Bretton Woods Agreement Act). A fitting sense of judicial restraint would dictate that the courts of no single State should enunciate a change, however large that State's relative proportion of foreign commerce may be, particularly since the authoritative effect thereof would necessarily be confined to the borders of that State.
Accordingly, I believe the order of the Appellate Division should be affirmed.
Order modified, without costs, and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.
NOTES
[*] There it is provided in relevant part: "Exchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member maintained or imposed consistently with this Agreement shall be unenforceable in the territories of any member. In addition, members may, by mutual accord, cooperate in measures for the purpose of making the exchange control regulations of either member more effective".
[*] Indeed there might be a thorny issue as to whether enforcement is direct or indirect  i.e., whether a particular plaintiff should indeed be considered to be an "instrumentality" of a foreign government. Thus, our courts would be required to undertake an assessment of the practical impact and significance of the economic as well as legal sanctions which the particular foreign government might bring to bear. The question would be whether the private corporation or other entity enjoyed such protected freedom of independent action that it should be determined, de facto as well as de jure, not to be an instrumentality of the foreign government. Our courts would normally be ill equipped to undertake such an inquiry, and to embark on it would be to reach for determination beyond our competency of satisfactory resolution.