Wachtler, J. (dissenting).
We are asked to determine when claims between private parties which spring from jural relationships created by the laws of a foreign country, here Brazil, may be enforced in our courts. The issue turns on the essential nature of the rights and obligations sought to be enforced as the forum court characterizes them. As stated by the United States Supreme Court: "The test is not by what name the statute is called by the legislature or the courts of the State in which it was passed, but whether it appears to the tribunal which is called upon to enforce it to be, in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a private person.” (Huntington v Attrill, 146 US 657, 683; also City of Philadelphia v Cohen, 11 NY2d 401, 406; State of Maryland v Turner, 75 Misc 9, 11.)
I believe that the relief sought here, albeit indirectly through plaintiff bank, is an aspect of the Brazilian government’s sovereign management of the economy of its own country. This is not a matter involving the resolution of private rights only as those rights are defined under the laws of a foreign State. Were that so our courts would not withhold judicial sanction even if the definition of such private rights were somewhat different from our own, "unless some sound reason of public policy makes it unwise for us to lend our aid” (Loucks v Standard Oil Co., 224 NY 99, 110).
There is no allegation in this complaint that defendants intended to or succeeded in defrauding plaintiff of foreign currency exchange in the private rights sense. On the contrary, from all that appears, defendants obtained no more United States dollars in consequence of their alleged fraud than they would have been entitled to receive at the then currently effective exchange rate for the Brazilian cruzeiros which they exchanged with plaintiff bank. The gravamen rather is that the fraud and deceit practiced by the defendants induced plaintiff bank to violate Brazilian currency exchange regulations, thereby exposing that bank to consequent penalties which would be imposed by the Brazilian Government.
*601 It has long been recognized that the courts of one jurisdiction will not enforce the tax laws, penal laws, or statutory penalties and forfeitures of another jurisdiction. "The rule that the courts of no country execute the penal laws of another applies not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the State for the recovery of pecuniary penalties for any violation of statutes for the protection of its revenue, or other municipal laws”. (Wisconsin v Pelican Ins. Co., 127 US 265, 290; also The Antelope, 10 Wheat [23 US] 66, 122-123; Huntington v Attrill, supra; Holman v Johnson, 1 Cowp 341; Banco do Brasil v Israel Commodity Co., 12 NY2d 371, 377, cert den 376 US 906; City of Philadelphia v Cohen, supra; James & Co. v Second Russian Ins. Co., 239 NY 248, 257.) Under the principle of territorial supremacy, fundamental to the community of nations, courts refuse to enforce any claim which in their view is a manifestation of a foreign State’s sovereign authority (Dicey & Morris, Conflict of Laws [8th ed], p 160; cf. Judge Learned Hand’s concurring opinion in Moore v Mitchell, 30 F2d 600). The proper question is whether in the particular instance the claim sought to be enforced is a manifestation of such sovereign authority.
In previous cases our court held that governmental foreign exchange regulation may present an aspect of the exercise of sovereign power by a foreign State to implement its national fiscal policy. Thus, in Banco do Brasil v Israel Commodity Co. (supra), we decided that our courts were not open to enforce a Brazilian foreign currency exchange regulation. Although the regulation in that case was characterized as a revenue measure, the essence of the matter was that we declined to enforce what we considered to be an exercise of Brazil’s sovereign power. Whether a regulation denominated "currency exchange regulation” has or does not have a revenue-producing effect, it must be presumed to have been adopted to accomplish fiscal regulation and ultimate economic objectives significantly similar to, if not identical with, the objectives which underlie what would be characterized as revenue measures—namely, governmental management of its economy by a foreign country. Accordingly, the result is not determined by the threshold appearance of the particular law sought to be enforced or whether such law be denominated by the foreign government as a penal law or a revenue law or otherwise. The bottom line is that the courts of one country will not enforce *602 the laws adopted by another country in the exercise of its sovereign capacity for the purpose of fiscal regulation and management.
Although our earlier decisions in Perutz v Bohemian Discount Bank in Liquidation (304 NY 533), and Industrial Export & Import Corp. v Hongkong & Shanghai Banking Corp. (302 NY 342), may appear to be to the contrary, a studied analysis dispels this apparent inconsistency. These cases merely refine the traditional conflict-of-laws rule by holding that the provisions of any international agreement to which the United States is a party supplement, and to that extent, supersede the traditional rule. For instance, the Bretton Woods Agreement Act (US Code, tit 22, § 286), authorizes United States membership in the International Monetary Fund (60 US Stat 1401; 2 US Treaty Developments, Dec. 27, 1945, T.I.A.S. 1501). Another example of such a treaty is article VIII (§ 2, subd [b]) of the International Monetary Fund Agreement (60 US Stat 1411) making exchange contracts which are contrary to the exchange control regulations of a member (Brazil is a member) unenforceable in the territory of another member (United States). So in Perutz (supra), relying on the provisions of the Bretton Woods Agreement Act we refused to enforce a private agreement contrary to Czechoslovakian exchange control regulations. Similarly, in Industrial Export & Import Corp. (supra), we refused to enforce a private contract contrary to the currency regulations of China on the basis of a separate agreement between the United States and China. Thus, by treaty provision what would otherwise have been the applicable rule of judicial nonrecognition of sovereign acts of a foreign State may be modified in the area of currency exchange control to require courts in the member States (including courts in the United States) to recognize foreign currency regulation as a defense.
Nothing in the Bretton Woods Agreement Act or in any other agreement between the United States and Brazil of which we are aware, however, mandates a complete abrogation of the normal conflicts rule or requires our courts affirmatively to enforce foreign currency regulation, as we are invited to do in the present case. This distinction was expressly recognized and held to be dispositive in Banco do Brasil (supra), in which we said (p 376): "An obligation to withhold judicial assistance to secure the benefits of such contracts [i.e., those violative of the foreign currency control regulation] does *603 not imply an obligation to impose tort penalties on those who have fully executed them.” (See Dicey & Morris, Conflict of Laws [8th ed], op. cit., p 161, n 19; pp 898-900.)
The appellant seeks to distinguish our decision in Banco do Brasil on the ground that the plaintiff in that case was recognized as an instrumentality of the Brazilian Government. I find this unpersuasive. As Judge Cardozo noted in the Loucks case (supra), a statute will be deemed to reflect the Sovereign’s interest if it "awards a penalty to the state, or to a public officer in its behalf, or to a member of the public, suing in the interest of the whole community to redress a public wrong * * * The purpose must be, not reparation to one aggrieved, but vindication of the public justice.” (Loucks v Standard Oil Co., supra, pp 102-103; cf. Huntington v Attrill, supra, pp 673, 681-682). Whenever vindication of the public interest is sought at the instance of a third person, as here by plaintiff bank, of necessity such third party must show "aggrievement” or no cause of action will lie. But any such formulation is incomplete.
The core of the issue here is enforcement of a Brazilian currency exchange regulation. The only "reparation” sought by this plaintiff is for damages sustained in consequence of violation of that regulation—penalties to be imposed on it by the Brazilian Government plus associated injury to its business and reputation in consequence of such violation. Damages which are wholly attributable to violation of such a regulation, although alleged to have been occasioned by defendants’ fraud, do not convert the action to one solely for private reparation. The ultimate economic reality, of granting relief to the plaintiff bank, would be the imposition on defendants of sanctions for violation of currency exchange control.
I recognize that this case is not an instance of recourse sought by a foreign country in our courts for the direct enforcement of its foreign currency exchange regulations, as would be the case were the Brazilian Government seeking here to recover penalties from either Banco-Brasileiro or from the defendants. The rights of private parties will be significantly affected; it is alleged that plaintiff bank has suffered and will suffer detriment in its private capacity in consequence of the fraud and deceit of defendants. The resolution of the issue posed by the motion to dismiss does not depend on the incidental, inescapable fact that private rights have already been, and would be affected by the judicial relief sought. *604 Rather, the determinative factor is that the primary objective and the ultimate practical effect of the relief sought would be the enforcement of the currency regulation system of a foreign country. Our courts are not open for the accomplishment of that end, and that it may be sought through private intermediaries does not change the result. It matters not whether enforcement is sought directly or indirectly (Dicey & Morris, Conflict of Laws [8th ed], op. cit, pp 160-161).*
I consider the plaintiff’s complaint as an attempt to utilize the judicial machinery of our courts to enforce the exercise of the sovereign power by the Government of Brazil. I believe that our courts, under traditional and established principle, are not available for this purpose.
The majority, however, argues that the time may have come for a change in what historically has been the applicable rule. I recognize that strong arguments can be mounted for a change in view of the increased frequency and importance of international commerce and the significantly different perspective in today’s world in which one nation views another nation and its interests. In my opinion, however, the responsibility for any change lies with our Federal Government rather than with the highest court of any single State. Change, if at all, in my view, would better come at the hands of the State Department and the Congress, through the negotiation of international agreement or otherwise in the discharge of the constitutional responsibility of the Federal Government "to regulate commerce with foreign nations” (cf. Bretton Woods Agreement Act). A fitting sense of judicial restraint would dictate that the courts of no single State should enunciate a change, however large that State’s relative proportion of foreign commerce may be, particularly since the authoritative effect thereof would necessarily be confined to the borders of that State.
Accordingly, I believe the order of the Appellate Division should be affirmed.
*605 Chief Judge Breitel and Judges Gabrielli, Jones, Fuchsberg and Cooke concur with Judge Jasen; Judge Wachtler dissents and votes to affirm in a separate opinion.
Order modified, without costs; and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

 Indeed there might be a thorny issue as to whether enforcement is direct or indirect—i.e., whether a particular plaintiff should indeed be considered to be an "instrumentality” of a foreign government. Thus, our courts would be required to undertake an assessment of the practical impact and significance of the economic as well as legal sanctions which the particular foreign government might bring to bear. The question would be whether the private corporation or other entity enjoyed such protected freedom of independent action that it should be determined, de facto as well as de jure, not to be an instrumentality of the foreign government. Our courts would normally be ill equipped to undertake such an inquiry, and to embark on it would be to reach for determination beyond our competency of satisfactory resolution.