S. A. JUDAH, etc., Appellant and Cross Appellee,

v.

DELAWARE TRUST COMPANY, etc., Appellee and Cross Appellant,

and

Shanghai Power Company, Appellee.

Supreme Court of Delaware.

Submitted Jan. 14, 1977.

Decided Aug. 11, 1977.

Petition for Reargument Denied Oct. 3, 1977.

Irving Morris, and Joseph A. Rosenthal, of Morris & Rosenthal, Wilmington, and Hart H. Spiegel, Philip W. Coyle, and David J. Wynne, of Brobeck, Phleger & Harrison, San Francisco, Cal., for appellant and cross-appellee, S. A. Judah.

Hugh L. Corroon, and Somers S. Price, Jr., of Potter, Anderson & Corroon, Wilmington, for appellee and cross-appellant, Delaware Trust Co.

Rodney M. Layton, and R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, and Richard C. Allison, and Marvin G. Goldman, of Reid & Priest, New York City, for appellee, Shanghai Power Co.

S. Samuel Arsht, and Lewis S. Black, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, and Richard M. Buxbaum, Berkeley, Cal., for amicus curiae for Warren R. Rado.

1. See Chancery Court R. 56.

2. The stock is denominated as "Silver Preferred Stock" in SPC's certificate of incorporation.

Before McNEILLY, J., and O'HARA and WALSH, JJ.

McNEILLY, Justice:

In this declaratory judgment action, seeking a determination that certain stock and debentures of plaintiff Shanghai Power Company (SPC) are without value, the primary question before this Court is whether the Court of Chancery properly granted SPC's motions for summary judgment against defendants S. A. Judah (Judah) and Delaware Trust Company (DTC).[1]

I.

Because of the complexity of this case, we set forth its procedural posture: Plaintiff SPC filed a complaint in the Court of Chancery seeking a judgment declaring its 6 Tael Silver Preferred Stock (Silver Preferred Stock)[2] and 5½% Mortgage Debentures due 1973 (Debentures) are without value. DTC, as successor trustee under Mortgage and Deed of Trust dated February 1, 1933 (Indenture), filed an answer and counterclaim seeking a declaratory judgment determining that the Debentures are not without value and that the holders of the Debentures are entitled to proceeds of war claims action received by SPC. Defendant Judah also filed a counterclaim, seeking a declaratory judgment determining that the Silver Preferred Stock is not without value and ordering that SPC be wound up and dissolved with SPC's assets being distributed to the holders of the Silver Preferred Stock.

After the filing of motions for summary judgment by SPC and Judah, the Court of Chancery (1) granted SPC's motions for summary judgment, declaring the Silver Preferred Stock and Debentures to be without value, (2) denied Judah's motion for summary judgment and dismissed his counterclaim with prejudice, determining that Judah's action was maintained as a class action,[3] the class consisting of all holders of

3. See Chancery Court R. 23.

the Silver Preferred Stock,[4] and dismissed DTC's counterclaim with prejudice.[5]

We affirm in part and reverse in part, remanding the case for trial on the question of the value of the Silver Preferred Stock.

## II.

Plaintiff SPC, organized in 1929 under the laws of Delaware to acquire and operate a utilities system in the International Settlement of Shanghai, China, financed the undertaking with several classes of capital, consisting of the Silver Preferred Stock, $7 Second Preferred Stock, and Common Stock, and with the Debentures. Both the $7 Second Preferred Stock and Common Stock are entirely owned by Far East Power Corporation, whose common stock is 80% owned by Brazilian Electric Power Company, while the latter corporation's common stock is entirely owned by Boise Cascade Corporation. The only remaining debt of importance is the Debentures.

During 1930 and 1931, 220,000 outstanding shares of the Silver Preferred Stock were sold in China, while the Debentures were also sold in China from 1933 to 1935. The dividend rights, liquidation preferences and terms of redemption of the Silver Preferred Stock are set forth in relation to the Shanghai Tael, a local unit of monetary exchange used at that time.[6] The Debentures, originally denominated in Shanghai Taels, were subsequently issued in Chinese

Silver Dollars, which replaced local units of exchange during this period; presently all Debentures are denominated in relation to Chinese Silver Dollars.

On November 6, 1935, the Chinese Kuomintang Government issued a "Decree on Measures for Stabalizing Currency and Banking" (1935 Decree), abolishing the use of silver for currency purposes.[7] In 1937, holders of 99.5% of the Debentures, in response to a solicitation by SPC, entered into an agreement (1937 Agreement) with SPC (the text of which is stamped on the face of the Debentures), by which they relinquished the right to receive payment in Chinese Silver Dollars or their equivalent in silver.[8] No such agreement was made with the holders of the Silver Preferred Stock.

During Chinese-Japanese hostilities in 1937, the Japanese caused significant damage to SPC's facilities; during World War II the Japanese seized the facilities, preventing their operation. SPC resumed active operations after the war, but in 1950 the new Communist Government expropriated all SPC property in Shanghai. Since 1950, SPC has not engaged in active operations; however, significant assets have accrued to the company from the settlement of war claims.[9] Partial payment of $4,801,301.58 from a $7,808,208.12 award for damages suffered at the hands of the Japanese has been made, while a claim of over $53,000,000. for the expropriation of SPC's property by the Communists has been certi-

---

4. No challenge has been made to the class action status of Judah's suit.

5. See *Shanghai Power Company v. Delaware Trust Company, et al.*, Del.Ch., 316 A.2d 589 (1974).

6. There being some contention concerning whether the Shanghai Tael was a unit of currency or a unit of measurement, we refrain from characterizing it as either and will attempt to characterize other disputed factual areas in a neutral manner.

7. The 1935 Decree provides in pertinent part:
   "1. As from November 4, 1935, the banknotes issued by the Central Bank, the Bank of China, and The Bank of Communications shall be full legal tender. Payment of taxes and

discharge as well as the collection of all public and private obligations shall be effected by legal tender notes. No use of silver dollars or bullion for currency purposes shall be permitted . . . ."
   "5. All contractual obligations expressed in terms of silver shall be discharged by the payment of legal tender notes in the nominal amount due. . . . ."

8. Mr. Warren Rado, a holder of unstamped Debentures not subject to the 1937 Agreement, previously was denied leave to intervene in the cause below.

9. See War Claims Act of 1948, 50 U.S.C.App. § 2001 et seq.

fied by the Foreign Claims Settlement Commission.[10]

While active operations of SPC were curtailed and finally halted, devaluations eroded the worth of Chinese currencies. In 1933, the Chinese Silver Dollar replaced local units of exchange, while the 1935 Decree substituted the Chinese Dollar for the Chinese Silver Dollar. Subsequently, in 1948, after extended periods of inflation, the Gold Yuan was substituted for the Chinese Dollar at a ratio of 1 Gold Yuan to 3,000,000 Chinese Dollars. After the Communists took power, the jen-min-pi replaced the Gold Yuan, with 1 jen-min-pi equaling 100,000 Gold Yuan. Finally, in 1955, a new jen-min-pi replaced the old jen-min-pi at an exchange ratio of 1 new to 10,000 old. Without rendering a quantitative analysis, an application of the conversion ratios apparently leaves both the Shanghai Tael and Chinese Dollar worthless.

## III.

■ We turn first to the contentions of defendant Judah, noting at the outset several underlying principles governing the rights of shareholders. Generally, the provisions of the certificate of incorporation govern the rights of preferred shareholders, the certificate of incorporation being interpreted in accordance with the law of contracts, with only those rights which are embodied in the certificate granted to preferred shareholders. *Ellingwood v. Wolf's Head Oil Refining Co.*, Del.Supr., 27 Del.Ch. 356, 38 A.2d 743 (1944). Additionally, the teachings of *Zahn v. Transamerica Corp.*, 3rd Cir., 162 F.2d 36 (1947), mandate that close judicial scrutiny be given the actions of management which serve to prejudice the interests of subordinate security holders. Boise Cascade Corporation, the ultimate owner of most of the remaining SPC stock, controls SPC's board of directors and stands to benefit by a disposition of this matter in accordance with SPC's request. Where the majority shareholders stand to benefit at the direct expense of the minority shareholders by action of a board of directors they control, the backdrop provided by the fiduciary obligations owed by the directors to the minority requires that the proposed action be closely examined before being effectuated.

### A.

■ Judah first contends that the Court of Chancery erred in determining that SPC has no alternative but to make payment to holders of the Silver Preferred Stock with reference to Chinese currency substituted for the Shanghai Tael, thereby rendering the Silver Preferred Stock worthless. Since this portion of our discussion will focus on the provisions of SPC's certificate of incorporation governing the rights of the holders of the Silver Preferred Stock, the pertinent provisions of the certificate are set forth below:

"The Silver Preferred Stock is entitled to cumulative dividends at the rate of 6 Shanghai Taels per annum and no more, payable on such dates as the Board of Directors may from time to time determine. In the event of any liquidation, dissolution or winding up of the affairs of the corporation, or any distribution of its capital, whether voluntary or involuntary, or any proceeding resulting in any distribution of all its assets to its stockholders, the sum to which the Silver Preferred Stock shall be entitled, in preference to the Second Preferred Stock and Common Stock, is 100 Shanghai Taels per share.

"The redemption price of the Silver Preferred Stock is 110 Shanghai Taels for each share of such Silver Preferred Stock redeemed.

"Notwithstanding anything in this resolution stated to the contrary, each obligation and/or right of the corporation expressed in this resolution with reference to any payment in taels on account of the Silver Preferred Stock, whether as to dividends or as to distribution of assets or as to redemption of any of such stock or otherwise, shall be measured and de-

---

**10.** See International Claims Settlement Act of 1949, 22 U.S.C. §§ 1643–1643k.

termined with reference to the Shanghai Tael which for all purposes hereof is defined as a unit of currency representing 518.512 grains troy (or 33.599 grammes of pure silver (1000 fine) and any payment by the corporation in either silver bullion or in any coin or coins or any money which shall give the stockholder the same quantity of silver as he would have obtained had he been paid in Shanghai Taels as herein defined, shall be considered a satisfaction of all the corporation's obligations in respect of said Silver Preferred Stock; provided further that if the Shanghai Tael, as so defined, shall cease to be a unit of currency or exchange in the territory on December 31, 1929, or thereafter comprised within the Foreign Community of Shanghai, China, north of the Yangkingpang, and some other unit shall be substituted therefor or be currently used in lieu thereof, whether of the same or of a different name, then from and after such substitution or such change in current usage each obligation and/or right of the corporation expressed herein with reference to any payment in taels on account of the Silver Preferred Stock, whether as to dividends or as to distribution of assets or as to redemption of any of such stock or otherwise, shall, at the option of the corporation, be an obligation and/or right, as the case may be, of the corporation to make such payment in silver or in such other unit of currency in such amount in each case as would be the equivalent in said other unit of currency of the amount of said payment in Shanghai Taels, the basis for the determination of such equivalent amount being the ratio existing between the Shanghai Tael and such other unit of currency at the time of such substitution or such change in current usage.

"Every dividend and/or payment in distribution of assets and/or payment in redemption with respect to the Silver Preferred Stock may be paid in each case in silver or in any currency (whether representing the Shanghai Tael or any other unit of currency substituted therefor or currently used in lieu thereof as herein provided) at that time legal tender in the territory on December 31, 1929, or thereafter comprised within the territory now embraced within the Foreign Community of Shanghai, China, north of the Yangkingpang, for the payment of either private debts or public taxes, as the Board of Directors shall elect."

The Vice-Chancellor, in ruling on the motions for summary judgment, concluded the reference to a specific amount of silver in the definition of the Shanghai Tael was only to set a standard of payment should SPC elect to exercise its option to pay in silver. Accordingly, it interpreted the preceding provisions as permitting payment in Shanghai Taels, silver or in a currency substituted for the Shanghai Tael. Since the Vice-Chancellor also determined that the option to pay in silver was negated by the 1935 Decree, the silver measurement provision was deemed to have no present legal effect. Additionally, the substitution of the Chinese Silver Dollar for local units of exchange rendered the option of paying in Shanghai Taels unavailable; therefore, the court below concluded, payment could only be made in substituted currency, which, by application of the previously noted conversion ratios, leaves the Silver Preferred Stock worthless.

Judah disagrees with the Vice-Chancellor's analysis, contending that in addition to the previously noted options, SPC also has the option of making payment in a currency giving silver's worth. We agree with Judah to the extent that we find ambiguity in the meaning of certain provisions of the certificate of incorporation; it *could* be construed to permit this fourth mode of payment.

Uncertainty in construction of the certificate arises from two primary sources, although, as will be discussed, other factors are also relevant to a determination of the meaning of the certificate. First, insertion of the definition of the Shanghai Tael in the certificate in place of the words "Shanghai Tael" could lead to the conclusion that the board of directors has the

option of paying the holders of the Silver Preferred Stock in relation to a currency worth a stated amount of silver. To illustrate, set forth below is a portion of the certificate with the definition of the Shanghai Tael inserted twice in emphasis:

". . . if the Shanghai Tael, as so defined, shall cease to be a unit of currency or exchange in the territory on December 31, 1929, or thereafter comprised within the Foreign Community of Shanghai, China, north of the Yangkingpang, and some other unit shall be substituted therefore or be currently used in lieu thereof, whether of the same or of a different name, then from and after such substitution or such change in current usage each obligation and/or right of the corporation expressed herein with reference to any payment in taels on account of the Silver Preferred Stock, whether as to dividends or as to distribution of assets or as to redemption of any such stock or otherwise, shall, at the option of the corporation, be an obligation and/or right, as the case may be, of the corporation to make such payment in silver or in such other unit of currency in such amount in each case as would be the equivalent in said other unit of currency of the amount of said payment in *a unit of currency representing 518.512 grains troy (or 33.599 grammes) of pure silver (1000 fine)*, the basis for the determination being the ratio existing between . . . *a unit of currency representing 518.512 grains troy (or 33.599 grammes) of pure silver (1000 fine)* and such other unit of currency at the time of such substitution or such change in current usage." (emphasis added)

Second, Judah contends vigorously that the Shanghai Tael is a unit of measurement rather than a unit of currency, citing, e. g., *M. Collins, Wayfong—The Hongkong and Shanghai Banking Corporation* 53, 203 (London, 1965); H. Vinacke, *The Problems of Industrial Development in China* ch. 4 (Princeton, 1926), while SPC asserts that the Shanghai Tael is a unit of currency and that recurrent links between old and new monetary systems define the amount of the

obligation, citing F. Mann, *The Legal Aspect of Money* 274 (3d ed. London 1971). Should the Trial Court agree with Judah, it could reach the conclusion that the currency conversion ratios are inapplicable to the resolution of this controversy.

We find it conceivable to conclude from the foregoing that the corporation and shareholders contemplated that in the event another currency or currencies were substituted for the Shanghai Tael (or for a currency previously substituted for the Shanghai Tael), a dividend in the then substituted currency would be paid in reference to a unit of currency containing the amount of silver stated in the definition, the reference point in time for determining the amount of the dividend being the date of introduction of the substituted currency. This by no means constitutes an endorsement of this, or any other interpretation of the certificate of incorporation; we discuss it only to point out perceived ambiguities previously a ruling of law without further factual determination.

■ Other evidence may also be relevant to determining the meaning of the certificate of incorporation. Judah has pointed to the political, social and economic climates of Shanghai and of China in the 1930's as bearing on the probable intent of the parties involved in the sale and purchase of the Silver Preferred Stock. Such evidence could properly be considered by the Trial Court in reaching the correct interpretation of the certificate. Also relevant is evidence of how the parties previously interpreted the certificate of incorporation, i. e., form and amount of dividend payments by SPC.

Judah raises other issues concerning the proper construction of the certificate of incorporation; however, in view of the preceding conclusions, there is no need to discuss them. Any questions material to construction of the certificate may be raised on remand and any evidence relevant to the resolution of those questions may be offered.

■ Other triable issues have been raised. The court below, after concluding

that the board of directors were required to pay the holders of the silver Preferred Stock in silver or substituted currency (without reference to silver's worth), determined that the 1935 Decree precluded payment in silver. While all parties apparently agree with this determination, there is dispute as to whether the 1935 Decree should be given legal effect, Judah contending that it is inapplicable to this controversy; Judah generally argues that the laws of a government out of power some twenty-seven years should not govern the rights of shareholders of a Delaware corporation, which is not doing business in China, in a dispute being resolved in the Delaware courts. More specifically, the Vice-Chancellor should consider whether the 1935 Decree is a revenue law not usually given extraterritorial effect. See generally, *City of Detroit et al. v. Proctor,* Del.Super., 5 Del.Super. 193, 61 A.2d 412 (1948); *Banco Do Brasil, S.A. v. A. C. Israel Commodity Co., Inc.,* 12 N.Y.2d 371, 239 N.Y.S.2d 872, 190 N.E.2d 235 (1963). Additionally, if it should be concluded that the 1935 Decree has extraterritorial effect, the Trial Court should then determine if the 1949 Provisional Constitution of the People's Republic of China, providing in Article 17 that "All laws, decrees and judicial systems of the Kuomintang reactionary government which oppressed the people shall be abolished. . . ." [11] renders the 1935 Decree a nullity. While matters of foreign law are determined as questions of law,[12] it is entirely appropriate for the Trial Court to consider relevant evidence before reaching its decision. See generally, *Walton v. Arabian American Oil Co.,* 2d Cir., 233 F.2d 541, 543, cert. denied, 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956).

### B.

■ Judah next contends that since SPC has the ability to make payment in silver, the Silver Preferred Stock cannot be declared worthless at this time. Emphasizing "at this time," Judah asserts that before the controversy is ready for decision, the board of directors must first call the stock for redemption and elect to pay its obligations in worthless currency. We find this argument unpersuasive because Judah admitted in his pleadings that a declaratory judgment action provided the most orderly and effective method of resolving this controversy, and more important, it has not been demonstrated that delaying these proceedings for further board action with respect to a redemption would either clarify the issues or allow supplementation of evidence to be presented.

### C.

■ Finally, Judah presents an argument which we conclude was properly disposed of below; that the fiduciary obligations of SPC's directors prevent their electing to pay worthless currency to the holders of the Silver Preferred Stock. Drawing parallels between this case and *Zahn v. Transamerica Corp.,* supra, where the board of directors of Axton-Fisher, controlled by Transamerica, owning virtually all of the Class B stock of Axton-Fisher, called the Class A stock for redemption and then liquidated Axton-Fisher (with the Class A shareholders receiving much less in redemption than they would have received in liquidation), Judah argues that SPC's board of directors is here acting to the detriment of the holders of the Silver Preferred Stock for the benefit of Boise Cascade Corporation, the ultimate owner of most of the remaining SPC stock. Although the *Zahn* case requires close judicial scrutiny before disposition of this matter, as previously noted, the determinative question before us is whether the stock has value under any circumstances. In *Zahn* the board of directors had several options open to it; here we are attempting to determine the existence of options.

### IV.

Delaware Trust Company, trustee under the Indenture, representing holders of

---

11. *Fundamental Documents of Communist China 41* (A. Blaustein ed. 1962).

12. Ch.Ct.R. 44.1.

99.5% of the Debentures party to the 1937 Agreement with SPC by which they relinquished certain rights, also asserts that various disputed material questions of fact render the granting of summary judgment as to it improper. We disagree with DTC.

Our consideration of DTC's contentions is made with several underlying principles in mind. The facts must be viewed in the manner most favorable to the nonmoving party, *Schagrin v. Wilmington Medical Center, Inc.,* Del.Super., 304 A.2d 61 (1973); *National Fire Insurance Co. v. Eastern Shore Laboratories,* Del.Super., 301 A.2d 526, 528 (1973), with all factual inferences taken against the moving party and in favor of the nonmoving party, 6 J. Moore, *Federal Practice* ¶ 56.15[8] (2d ed. 1976), and the moving party has the burden of demonstrating that there is no material question of fact, *Collins v. F. W. Woolworth Co.,* Del.Supr., 295 A.2d 732 (1972).

### A.

DTC first contends that summary judgment was inappropriate because the intent of the parties (the corporation and purchasers of the Debentures) to the 1933 Registered and Bearer Bond Texts under the Indenture and the 1937 Agreement is a disputed material question of fact which cannot be decided without the benefit of trial and which must be decided before the Debentures can be declared without value.

The pertinent portion of the 1933 Registered and Bearer Bond Texts (1933 Agreement) under the Indenture is as follows:

"Notwithstanding anything herein or in the Mortgage or in any of the debentures and/or coupons of the 5½% Dollar Series due 1973 stated to the contrary, each obligation of the company expressed herein on account of any payment in Chinese silver dollars, whether of principal or interest or on redemption of any such debentures, or otherwise, shall be measured and determined in relation to the Chinese silver dollar which for all purposes hereof is defined as a unit of currency containing 23.493448 grammes of pure silver (1000 fine), and shall be payable at the option of the company in Chinese Silver Dollars as above defined or in Shanghai mint bars or in commercial bar silver current in any of the principal silver markets of the world, in each case in an amount which shall give the holder hereof 23.493448 grammes of pure silver (1000 fine) for each Chinese Silver Dollar stated to be payable, or in any money containing the same quantity of silver based on 1000 fine as is represented by the number of Chinese Dollars stated to be payable . . ."

Thereafter, holders of 99.5% of the debentures entered into the 1937 Agreement with SPC, the text of which was stamped on the effected Debentures, giving up certain rights in return for a premium. The 1937 Agreement reads as follows:

"For value received the holder of this debenture has agreed for himself and each successive transferee or holder thereof that all interest accruing on this debenture on or prior to February 10, 1937, has been paid in full and that the Company has been discharged of all obligation to make any payment on account of this debenture in Chinese Silver Dollars or in any equivalent thereof in silver, and the holder of this debenture has agreed for himself and each successive transferee or holder thereof and the Company has agreed that from and after February 10, 1937, notwithstanding anything in this debenture or in the mortgage or in any of the debentures of Shanghai Power Company First Mortgage Debentures 5½ % Dollar Series due 1973 stated to the contrary, each obligation of the Company formerly expressed in this debenture in Chinese Silver Dollars or in any equivalent in silver or otherwise on account of payment whether of principal or interest or on the redemption of this debenture or otherwise shall be payable in a number of Chinese Dollars, Local Currency, equal in number to the number of Chinese Silver Dollars formerly stated to be payable . . . ."

SPC takes the position with respect to the holders of the Debentures subject to the

1937 Agreement that it is obligated to pay the holders in relation to currency substituted for the Chinese Silver Dollar, and that application of currency conversion ratios leaves their total obligation so minute as to render the Debentures in question worthless. On the other hand, DTC takes the position that payment should be made in relation to the amount of silver stated in the 1933 Agreement, or in the alternative, that material questions of fact as to the meaning of the 1933 and 1937 Agreements render the granting of SPC's summary judgment motion improper. Conceding only for purposes of discussion that the 1933 Agreement provides for payment in silver or in relation to the stated amount of silver, we cannot agree with DTC that ambiguity arises from consideration of the 1933 and 1937 Agreements in juxtaposition. The meaning of the 1937 Agreement is unclear, contends DTC, because while it states that all obligations are payable in a number of Chinese Dollars equal to the number of Chinese Silver Dollars formerly stated to be payable, the number of Chinese Silver Dollars formerly stated to be payable is required to be measured in relation to a unit of currency containing a set amount of silver (which makes the intent of the 1937 Agreement unclear).

In the 1937 Agreement the Chinese Silver Dollar, the currency formerly stated to be payable (as set forth in the 1937 Agreement), is defined as "an unit of currency containing 23.493448 grammes of pure silver (1000 fine)," that definition denominating the unit of currency containing the set amount of silver preferred to by DTC. This definition does not, as DTC contends, create any ambiguity as to the initial determination of the number of Chinese Silver Dollars owed the holders of the Debentures, because the set amount of silver merely defines the Chinese Silver Dollar and is equivalent to it. For each Chinese Silver Dollar previously due, or for each unit of

currency containing 23.493448 grammes of pure silver (1000 fine) previously due, SPC must pay the holders of the Debentures subject to the 1937 Agreement, one Chinese Dollar. This placed the risk of currency devaluation squarely on the holders of the Debentures, and noting the previously discussed conversion ratios, the Debentures subject to the 1937 Agreement have no value.

One other significant contention concerning the 1937 Agreement must be discussed. In 1949, at the time of the last interest payment, the board of directors of SPC decided to pay the holders at a rate of 1 Gold Yuan (the currency then in circulation in China) for each Chinese Dollar owed, when the conversion ratio was 3,000,000 Chinese Dollars to 1 Gold Yuan. This, argues DTC, raises a material question of fact as to the meaning of the 1937 Agreement, because the use of this payment scale indicates the possibility of an underlying obligation by SPC to pay the holders in silver's worth (and a recognition of this by the board). Therefore, they contend that they should be given the opportunity to prove this at trial.

Viewing this evidence in its most favorable light, see *Schagrin v. Wilmington Medical Center, Inc.,* supra, an examination of the minutes of the board of directors' meeting of February 1, 1949, at which payment was authorized, leads inescapably to the conclusion that the directors made the payment only as an accommodation to the holders and to prevent any possibility of SPC being held in default, as the true amount owed was much too small to pay. The minutes make clear that at that time the directors interpreted the 1937 Agreement as requiring the payment of 1 Chinese Dollar for each Chinese Silver Dollar owed, and nothing else. Pertinent portions of those minutes are set forth in the footnote.[13]

13. "The Chairman called attention to the fact that on February 10, 1949 interest would be payable on the Company's First Mortgage Debentures 5½% Dollar Series due 1973 issued and outstanding under the Company's Mort-

gage and Deed of Trust to Hongkong and Shanghai Banking Corporation, as Trustee, dated as of February 1, 1933; also to the facts that the holders of approximately 99½% of the aggregate principal amount of Debentures out-

## B.

■ It is next asserted that where SPC's purpose and intent with respect to its cash assets is a disputed material issue of fact, summary judgment should not have been granted. The material question of fact raises, contends DTC, concerning whether SPC's management is acting as the de facto receiver in dissolution of the company and is looking toward a liquidation and distribution of its assets to its sole common shareholder. Further, asserts DTC, under the circumstances, the company's assets should be treated as a trust fund for the primary benefit of creditors, citing *Berwick v. Associated Gas & Elec. Co.,* Del. Ch., 20 Del.Ch. 265, 174 A. 122 (1934).

The lower court correctly considered and disposed of this issue, finding it immaterial. We agree with the Vice-Chancellor, that the question raised by SPC goes to whether the Debentures have value under any circumstances. Since the Debentures subject to the 1937 Agreement are valueless for all purposes, the intentions of SPC concerning its assets is immaterial to the resolution of this appeal.

## C.

Finally, the DTC argues that summary judgment should not have been granted where there is a reasonable hypothesis demonstrating that the Debentures have value. As this contention simply reiterates earlier contentions, our previous conclusion that no material question of fact has been raised mandates rejection of this argument.

## V.

In summary, we affirm the actions of the Court of Chancery insofar as it (1) granted summary judgment to SPC declaring the 5½% Mortgage Debentures due 1973 to be without value, (2) dismissed defendant DTC's counterclaim seeking a declaratory judgment of the Debentures are not without value, (3) determined that the action maintained by defendant S. A. Judah is a class action, the class consisting of all holders of the Silver Preferred Stock, and (4) denied Judah's motion for summary judgment.

We reverse the Court of Chancery's decision insofar as it (1) granted summary judgment to SPC declaring that the Silver Preferred Stock is without value, and (2) dis-

standing had accepted the Company's offer as set forth in the minutes of the meeting of the Board of Directors of the Company held on April 16, 1937 to make their Debentures payable in Chinese dollars local currency; that as of August 19, 1948 the Chinese dollar local currency, commonly referred to as Chinese National Currency Dollars, had been converted into Chinese Gold Yuan upon the basis of 3,000,000 Chinese National Currency Dollars for one Chinese Gold Yuan, that while the regulations issued pursuant to the decree of August 19, 1948 contemplated the payment of public and private debts upon the basis of this ratio of conversion, the Chinese Courts acting under authority of a previous decree had undertaken to fix fair bases for discharge of outstanding obligations in terms of depreciated Chinese money and that the nature and amount of the Company's obligation with respect to principal and interest on such Debentures expressed in terms of the present Gold Yuan currency were subject to considerable doubt."

"The Chairman pointed out that under the Decree of August 19, 1948 the total amount due to all the bondholders would be $\frac{2,420,000}{3,000,000}$ = GY $.807, or less than one Gold Yuan and that

it was physically impossible to split this amount into the Yuan currency necessary to pay each bondholder his required amount, but that, on the one hand, the Company should not be in default under the Mortgage and Deed of Trust or, on the other hand, do anything that might prejudice or embarrass its action in the future or in any way affect its rights under the Mortgage and Deed of Trust; that the action should only relate to the payment of the interest due on February 10, 1949, and that in view, particularly, of the rapidly depreciating value of the Gold Yuan this interest payment might be at the rate of one Gold Yuan for one Chinese dollar."

"The Chairman further stated that the President of the Company had sent a communication from Shanghai saying that in his, the President's, opinion and in view of the rapidly depreciating value of the Gold Yuan the best interests of the Company and of all its security holders would be served by making payment of the February 10, 1949 interest upon this basis of one Gold Yuan in lieu of one Chinese National Currency Dollar. Said communication, which was dated December 20, 1948, was ordered marked for identification and filed among the records of the Company."

missed Judah's counterclaim seeking a declaratory judgment determining that the Silver Preferred Stock is not without value.

As previously noted, upon remand it would be proper for the Trial Court to consider permitting intervention by Mr. Warren Rado, a holder of Debentures not subject to the 1937 Agreement.[14]

**14.** *This Court, by Order of June 28, 1976, affirmed the Court of Chancery's Order denying application for leave to intervene as a defendant in this action. In the lower court's Opinion on the summary judgment motions, it concluded that* all *holders of the Debentures were limited in their demand for payment to value-* less substituted currency. 316 A.2d at 597. Since our decision hinges on the effect of the 1937 Agreement on the Debentures subject to it, and since Mr. Rado's Debentures are not subject to it, his Debentures may well have value.