**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

TAMIKA R. MONTGOMERY-REEVES
VICE CHANCELLOR

Leonard L. Williams Justice Center
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: June 13, 2017
Date Decided: July 11, 2017

Victoria K. Petrone, Esquire
George T. Lees III, Esquire
Logan & Petrone, LLC
One Corporate Commons
100 W. Commons Blvd., Suite 435
New Castle, Delaware 19720

Walter J. O'Brien, Esquire
The Law Offices of Sean M. Lynn, P.A.
308 South State Street
Dover, Delaware 19901

> RE:  ***Duffield Associates, Inc. v. Lockwood Brothers, LLC et al.,***
> Civil Action No. 9067-VCMR

Dear Counsel:

This letter opinion addresses plaintiff Duffield Associates, Inc.'s ("Duffield")

motion for summary judgment and motion for rule to show cause.  For the reasons

stated below, the motion for summary judgment is granted in part, and the motion

for rule to show cause is moot.

## I.     BACKGROUND

The following facts are provided in Duffield's briefs and attached documents.

Except as identified below, the facts are undisputed.  In 2005, John L. Stanton

executed an exclusive listing agreement with Rehoboth Bay Realty Co.

("Rehoboth") and a contract to sell certain property in Sussex County, Delaware (the

1

"Property") to Michael Pouls. Windmill Estates, LLC ("Windmill") was formed to develop the Property. Windmill is managed and owned by Darin A. Lockwood, Don Lockwood, John[1], and Pamala Stanton[2] (Pamala, collectively, with Don and John, the "Defendants"). The Limited Liability Company Agreement for Windmill identifies Don, Darin, and John as the members. Darin responded to interrogatories in the Superior Court litigation discussed below, however, by stating that Pamala jointly owned one-third of Windmill with John, and certain tax records show Pamala Stanton as an owner of Windmill.[3]

In 2006, Duffield, a Delaware corporation that engages in geotechnical consulting and engineering services, was contacted by Meridian Architects & Engineers ("Meridian"), a company owned by Darin, to assist in the design of a proposed wastewater treatment system on the Property. Duffield provided the proposal for the Property, which was accepted by Darin and Meridian. By the fall of 2007, issues arose between Meridian and Duffield regarding payment for Duffield's already-completed work, and Duffield refused to continue work on the

---

[1] Any reference to a party by first name is for clarity only. No disrespect or familiarity is intended.

[2] Duffield incorrectly refers to Pamala as Patricia.

[3] Pl.'s Mot. for Summ J. Ex. DD, at 15; *id.* Exs. EE-LL.

project. As a result, in April 2008, Darin and John executed a Bi-Lateral Corporate Guarantee (the "Guarantee") binding Meridian and Windmill to pay Duffield for its work.

In May 2008, Pouls filed suit to avoid his purchase of the Property and recover his $500,000 deposit. Windmill and Meridian directed Duffield to continue its work despite the Pouls litigation. By September 2009, Duffield was owed $82,153.17 plus interest. Between late 2009 and early 2010, Windmill's bank lender for the property, County Bank, commissioned a valuation of the Property and determined that there was a valuation shortfall of $250,000 on the property.[4] A representative for County Bank, Barry A. Breeding, stated in his deposition that the loan to Windmill matured on August 29, 2010 and, thus, was due to be paid in full or refinanced by that date.[5] Don then sent a letter to the bank on August 19, 2010, requesting an 18-month extension and to pay the interest out of pocket.[6]

On March 3, 2010, Duffield filed suit against Meridian, Windmill, John, and Darin in Delaware Superior Court for breach of contract. On June 10, 2010, the

---

[4]     *Id.* Ex. W.

[5]     *Id.* Ex. S, at 17-18; *id.* Ex. T.

[6]     *Id.* Ex. V.

Pouls litigation was resolved in favor of Windmill, awarding it the $500,000 deposit from Pouls. Pouls and Windmill later came to an agreement wherein Pouls would pay Windmill an additional $20,000 in attorney's fees and waive any continuing claims. In June 2010, Richard Berl, Windmill's attorney, received two checks from Rehoboth totaling $437,362.69. This money was transferred to a money market account on July 14, 2010 and remained there until August 2, 2010.

On August 2, 2010, Darin wrote to Berl indicating that John wanted to secure a check from Rehoboth funds and that John could not do this without his or Don's agreement. That same day, Darin wrote to Roy Frick, Windmill's accountant, directing the funds not be disbursed until an agreement by the members was reached. After back and forth regarding how to handle the money, John W. Paradee, Meridian and Darin's lawyer, wrote that he "strongly recommend[ed] that Darin and Don agree to satisfy Duffield's claim ASAP, while we still have a chance to do so. I'm not sure what other claims to the money there may be."[7] On August 2, 2010, Berl issued a check from his escrow account, payable to Windmill in the amount of $414,295.85.[8]

---

[7]  *Id.* Ex. Q.

[8]  *Id.* Ex. OO.

In his deposition, Don testified that John "came to [Don] and said, 'We have excess money, we're going to clear the account out.'"[9] Don admitted that he and John were aware of "a deficiency of a million-some dollars with the bank" at the time.[10] Don signed the check distributing the money to John.[11] Don also testified that there was never a vote among the Windmill members regarding the distribution of the funds.[12] On August 3, 2010, John and Don opened two new bank accounts on behalf of Windmill at The First National Bank of Wyoming. The same day, John and Don signed three checks for $80,000 each to Don, Darin, and John, disbursing $240,000 of the Pouls litigation money.[13]

Frick testified in his deposition that Don's capital contributions to Windmill were $73,866.67; his capital account was worth $59,000 prior to the deposit of the money from the Pouls litigation; and his total distribution after the August 3, 2010 disbursement was $114,770.[14] Similarly, Frick testified that John received a total of

---

[9]     *Id.* Ex. R, at 66-67.

[10]    *Id.*

[11]    *Id.*

[12]    *Id.*

[13]    *Id.* Ex. QQ.

[14]    *Id.* Ex. MM, at 102-05.

$150,000 in cash and loan forgiveness.[15]   Darin's capital contributions were $61,866.65, and he received $82,500 after August 3, 2010.[16]

On February 5, 2013, the Superior Court granted Duffield's motion for summary judgment against Windmill and Meridian for breach of the Guarantee, and on August 7, 2013, the Superior Court entered judgment in the amount of $82,153.17 plus pre- and post-judgment interest against Windmill.  That judgment has not been paid.

Defendants offer the following counter facts: Pamala is not in fact a member of Windmill; there are no judgments against Don or John; and there is no "actual intent" on the part of Don, John, or Pamala to defraud Duffield.  Defendants did not raise any material dispute as to any other facts.

On November 7, 2013, Duffield filed this action.  On July 11, 2016, I entered default judgment against Darin.  On January 20, 2017, I entered default judgment against Lockwood Brothers, LLC and granted the dismissal of claims against Rehoboth.  Duffield filed its motion for rule to show cause on January 30, 2017, and its motion for summary judgment on March 9, 2017.  On May 4, 2017, this Court

---

[15]     *Id.* Ex. MM, at 105.

[16]     *Id.* at 107.

held oral argument on these motions. On June 13, 2017, Duffield submitted a letter to the Court, in which it conceded it is not a proper plaintiff to assert Counts II and III for breach of fiduciary duty and breach of the Delaware Limited Liability Company Act.

## II. ANALYSIS

The complaint alleges three counts. Duffield later conceded that it is not a proper plaintiff to assert Counts II and III of the complaint. Therefore, I only address Count I—the claim for fraudulent conveyance.

Summary judgment will be "granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[17] When considering a motion for summary judgment, the evidence and the inferences drawn from the evidence are to be viewed in the light most favorable to the nonmoving party.[18]

Under Court of Chancery Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

---

[17] *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

[18] *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977).

Malice, intent, knowledge and other condition of mind of a person may be averred generally."[19]  "In an action to set aside a fraudulent conveyance the burden is on the creditor to prove that the conveyance was fraudulent."[20]  Under Section 1304 of the Delaware Uniform Fraudulent Transfer Act ("UFTA"):

> a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[21]

---

[19]   Ct. Ch. R. 9(b).

[20]   *U.S. v. West*, 299 F. Supp. 661, 663 (D. Del. 1969).

[21]   6 *Del. C.* § 1304.

"The UFTA provides remedies to creditors who are defrauded by debtors who transfer assets or incur obligations 'with actual intent to hinder, delay or defraud any creditor of the debtor' or, in certain circumstances, 'without receiving reasonably equivalent value.'"[22]

Based on the record before me, there is no dispute as to the facts that $240,000 was transferred from the Windmill account to Don, Darin, and John on August 3, 2010, and at the time of the transfer, Windmill was insolvent. At the May 4, 2017 hearing, counsel for Defendants argued that insolvency is dependent on the value of the real estate at the time of the transfer, and in order to ascertain that value, Breeding's "calculus" would need to be examined at trial.[23] As an initial matter, Defendants did not raise this argument in their briefing.[24] Defendants also did not point to any evidence disputing or refuting Breeding's deposition testimony or "calculus." Additionally, Don was aware of the valuation shortfall and asked for a loan extension; John instructed Don to agree to the disbursements and was aware this would wipe out Windmill's funds; and, John and Don signed the checks

---

[22]     *August v. August*, 2009 WL 458778, at *10 (Del. Ch. Feb. 20, 2009).

[23]     Oral Arg. Tr. 66.

[24]     *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999). ("Issues not briefed are deemed waived").

disbursing the amounts.[25] Defendants offered nothing to refute this evidence. As such, there is no genuine issue of material fact as to insolvency.

At oral argument, counsel for Defendants contended that Don, Darin, and John provided "reasonably equivalent value" in exchange for the money they received because the disbursement was a repayment of money provided to Windmill.[26] Defendants also did not include this argument in their answering brief.[27] Regardless, Frick testified in his deposition that each of Don, John, and Darin received payments totaling well above any money provided to the company.[28] Defendants did not offer any evidence to the contrary.

Defendants instead argue that "actual intent" remains at the very least, a genuine dispute of material fact that is ripe for trial. Actual intent is not required under Section 1304(a)(2)(b) of UFTA; it is only required under Section

---

[25]    Pl.'s Mot. for Summ. J. Ex. R, at 66.

[26]    Oral Arg. Tr. 64-65.

[27]    *Emerald P'rs*, 726 A.2d at 1224.

[28]    *See Seiden v. Kaneko*, 2015 WL 7289338, at *13 (Del. Ch. Nov. 3, 2015); *In re Plassein Int'l Corp.*, 428 B.R. 64, 67 (D. Del. 2010) (discussing three factors that courts emphasize when looking at the totality of the circumstances to assess "reasonably equivalent value": (1) whether the transaction was at arm's length; (2) whether the transferee acted in good faith; and (3) the degree of difference between the fair market value of the asset transferred and the price paid).

1304(a)(2)(a).[29]   And the undisputed facts show that the "reasonably equivalent value" prong of Section 1304(a)(2)(b) is satisfied.  Don and John, thus, are liable for fraudulent transfer.

The Delaware "Supreme Court has recognized the 'broad latitude' a court in equity has to craft a remedy appropriate to the circumstances of a fraudulent transfer."[30]  Under UFTA, the "remedies are broad and leave considerable space for the exercise of equitable discretion."[31]  The remedies are "cumulative and non-exclusive."[32]  Here, Duffield seeks a constructive trust, a full accounting of the proceeds of the distributions, and a disgorgement of any profits or proceeds from the transfers.  Defendants do not provide any argument regarding any of the remedies that Duffield seeks.  Thus, I grant Duffield the remedies it seeks.

---

[29]   *See Seiden*, 2015 WL 7289338, at *13; *August v. August*, 2009 WL 458778, at *10 (Del. Ch. Feb. 20, 2009); *Plassein*, 428 B.R. at 67 (discussing the two arms of 1304(a) in the disjunctive).

[30]   *August*, 2009 WL 458778, at *10 (citing *Hogg v. Walker*, 622 A.2d 648, 652-54 (Del. 1993)).

[31]   *Id.* (citing *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 199 (Del. Ch. 2006)).

[32]   *Id.*

Finally, I cannot grant summary judgment at this stage as to Pamala because both sides have presented conflicting evidence of her status as a member of Windmill, and no evidence has been presented with regard to her involvement in the alleged fraudulent acts. But, given the outcome of this motion for summary judgment, I suggest that Duffield seriously consider whether pursuing litigation against Pamala based on the evidence presented remains a worthwhile endeavor.

## III. CONCLUSION

For the reasons discussed above, I grant Duffield's motion for summary judgment as to Count I against defendants Don and John, holding them jointly and severally liable for the total amount of $82,153.17 plus pre- and post-judgment interest. I impose a constructive trust over the assets transferred to the defendants, order a full accounting of the proceeds of the distributions, and order disgorgement of any profits or proceeds from the transfers. I deny the motion as it relates to Count I claims against Pamala. The motion for rule to show cause is moot. The parties shall submit an order consistent with this opinion within ten (10) days. If Duffield decides to move forward with the remaining claim, a joint schedule also shall be submitted within ten (10) days of this opinion.

**IT IS SO ORDERED.**

Sincerely,

*/s/Tamika Montgomery-Reeves*

Vice Chancellor

TMR/jp